UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREST RESOURCE
COUNCIL, CARPENTERS
INDUSTRIAL COUNCIL, and
DOUGLAS COUNTY, OREGON,

Plaintiffs,

v.

DANIEL M. ASHE, Director, U.S. Fish
and Wildlife Service, and KEN SALAZAR,
Secretary of the Interior,

Defendants,

and

AUDUBON SOCIETY OF PORTLAND,
SEATTLE AUDUBON SOCIETY,
CENTER FOR BIOLOGICAL
DIVERSITY, OREGON WILD,
CONSERVATION NORTHWEST,
ENVIRONMENTAL PROTECTION
INFORMATION CENTER, and SIERRA
CLUB,

Defendant-Intervenors.

Civil Action No.  12-111 (JDB)

## MEMORANDUM OPINION

Plaintiffs American Forest Resource Council, Carpenters Industrial Council, and Douglas

County, Oregon (collectively, "AFRC") bring this action for declaratory and injunctive relief

against defendants Daniel M. Ashe, Director of the U.S. Fish and Wildlife Service, and Ken

Salazar, Secretary of the Interior (collectively, "FWS").  AFRC alleges that FWS violated the

1

Endangered Species Act, 16 U.S.C. §§ 1531 et seq., and the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., in its listing and critical habitat decisions concerning the marbled murrelet, a small Pacific seabird.  In three of its seven claims for relief, AFRC challenges FWS's determination that removing the Washington, Oregon, and California population of the murrelet from the Endangered Species Act list of threatened species was not warranted.  AFRC has moved for summary judgment on these three claims.  AFRC's other four claims challenge FWS's designation of critical habitat for the murrelet.  As to these claims, AFRC and FWS ask the Court to enter a proposed consent decree, pursuant to which the murrelet critical habitat designation would be vacated and FWS would issue a revised critical habitat designation by September 2018.  Intervenors, a group of conservation organizations, oppose both AFRC's summary judgment motion and the entry of the proposed consent decree.  For the reasons stated below, AFRC's motion for summary judgment will be granted in part and denied in part, and the joint motion for entry of a consent decree will be denied.

## BACKGROUND

### I.    Statutory and Regulatory Background

The Endangered Species Act ("ESA" or "Act") is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  It is intended "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

The ESA directs the Secretary of the Interior ("the Secretary"), who acts through FWS, to

list species that he determines are endangered or threatened.  See id. § 1533(a); Rancho Viejo,

LLC v. Norton, 323 F.3d 1062, 1064 (D.C. Cir. 2003); 50 C.F.R. § 402.01.  An "endangered

species" is one that is "in danger of extinction throughout all or a significant portion of its range";

a "threatened species" is one that is "likely to become an endangered species within the

foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20).

The term "species" includes "any subspecies of fish or wildlife or plants, and any distinct

population segment of any species of vertebrate fish or wildlife which interbreeds when mature."

Id. § 1532(16).  The term "distinct population segment" ("DPS") is not defined in the ESA, but

has been interpreted in a 1996 joint policy issued by FWS and the National Marine Fisheries

Service ("NMFS").  See Policy Regarding the Recognition of Distinct Vertebrate Population

Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722 (Feb. 7, 1996);

see also Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1145 (9th Cir.

2007) (holding that "the DPS Policy is a reasonable construction of 'distinct population

segment'").  The DPS Policy identifies three elements to be considered in deciding whether a

DPS exists: (1) the discreteness of the population segment in relation to the remainder of its

species; (2) the significance of the population segment to its species; and (3) the population

segment's conservation status in relation to the ESA's listing standards.  See 61 Fed. Reg. at

4725.

An interested party may file a petition to list or delist a species.  See 16 U.S.C.

§ 1533(b)(3).  Within 90 days of receiving such a petition, FWS must, to the extent practicable,

"make a finding as to whether the petition presents substantial scientific or commercial

information indicating that the petitioned action may be warranted" and publish this finding in

the Federal Register.  Id. § 1533(b)(3)(A).  FWS then has one year to conduct a status review to

determine whether the petitioned action is warranted, not warranted, or warranted but precluded.

Id. § 1533(b)(3)(B).

     The ESA also directs the Secretary to designate certain geographical areas as "critical

habitat."  See 16 U.S.C. § 1533(c).  Critical habitat is defined as:

> (i) the specific areas within the geographical area occupied by the species, at the
> time it is listed in accordance with the provisions of section 1533 of this title, on
> which are found those physical or biological features (I) essential to the
> conservation of the species and (II) which may require special management
> considerations or protection; and
>
> (ii) specific areas outside the geographical area occupied by the species at the time
> it is listed in accordance with the provisions of section 1533 of this title, upon a
> determination by the Secretary that such areas are essential for the conservation of
> the species.

Id. § 1532(5)(A).  Physical and biological features that are essential to the conservation of a

species and that may require special management considerations or protection are known as

"primary constituent elements" or "PCEs."  See 50 C.F.R. § 424.12(b).

     Critical habitat designations must be made "on the basis of the best scientific data

available and after taking into consideration the economic impact, the impact on national

security, and any other relevant impact, of specifying any particular area as critical habitat."  Id.

§ 1533(b)(2).  Under section 4(b)(2) of the Act, FWS "may exclude any area from critical habitat

if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area

as part of the critical habitat," unless it determines that "the failure to designate such area as

critical habitat will result in the extinction of the species concerned."  Id.

     Once a species is listed under the ESA, it gains the benefit of a host of protective

measures.  Prominent among these is what is known as the section 7 consultation requirement.

Under section 7(a)(2) of the Act, every federal agency is required to ensure that any action it

authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification of

[critical] habitat of such species."  16 U.S.C. § 1536(a)(2).  Also, the ESA prohibits the "take" of

any listed species.  Id. § 1538(a)(1); 50 C.F.R. § 17.31(a).  The term "take" means "to harass,

harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any

such conduct."  16 U.S.C. § 1532(9).

## II.     Factual and Procedural Background

The marbled murrelet is a small, diving seabird that inhabits the waters along the Pacific

coast of North America and nests primarily in old-growth forests near the coast.  AR 6747.  The

murrelet's range is from central California to the Aleutian Islands of Alaska.  Id. at 6748.

Marbled murrelets have been recognized as comprising three genetic units: (1) the western and

central Aleutian Islands, (2) the eastern Aleutian Islands to northern California, and (3) central

California.  Id. at 7, 6789.  Murrelets face threats from the logging of old-growth nesting habitat

and other sources and are declining throughout their range.  Id. at 6885, 8415.

FWS listed the Washington, Oregon, and California ("tri-state") population of the

marbled murrelet as a threatened species in 1992.  57 Fed. Reg. 45,328 (Oct. 1, 1992).  At that

time, FWS deemed the tri-state population of the murrelet "to constitute a distinct population

segment comprising a significant portion of the eastern Pacific subspecies of the marbled

murrelet."  Id. at 45,330.  But in the final rule listing the murrelet FWS noted: "[S]ome question

remains whether the population listed in this rule qualifies for protection under the Act's

definition of 'species.'"  Id.  FWS did not designate critical habitat for the murrelet at that time, stating that it "lack[ed] sufficient information to perform required analyses of the impacts of a critical habitat designation."  Id. at 45,336.

In 1994 FWS published a proposed rule for the designation of murrelet critical habitat. 59 Fed. Reg. 3811 (Jan. 27, 1994).  After receiving public comments, FWS issued a final designation of critical habitat on May 24, 1996; it designated 3,887,800 acres of federal and non-federal lands in Washington, Oregon, and California as critical habitat for the murrelet.  61 Fed. Reg. 26,256 (May 24, 1996).

In March 2002, AFRC and three of its members filed suit in the District of Oregon, seeking to compel FWS to conduct a five-year status review of the murrelet DPS and challenging the 1996 critical habitat designation.  See Am. Forest Res. Council v. Dep't of Interior ("AFRC I"), No. 02-6087 (D. Or.).  The parties subsequently entered into a settlement agreement, pursuant to which FWS agreed to do a five-year status review and initiate a rulemaking to consider potential revisions to the murrelet critical habitat designation.

FWS completed the five-year status review in 2004, and in it concluded that the tri-state population of the murrelet remained threatened.  See AR 8388.  However, FWS also concluded that the tri-state population did not qualify as a DPS under the DPS Policy because the tri-state population was "not discrete."  Id. at 8382.  Despite this conclusion, FWS said that there would be no change to the species' threatened status, at least not until after the completion of a "range-wide" status review.  Id. at 8395.  AFRC subsequently filed suit in this Court challenging FWS's five-year status review, including its decision not to change the murrelet's listing status.  See Am. Forest Res. Council v. Hall ("AFRC II"), 533 F. Supp. 2d 84 (D.D.C. 2008).  This Court held that

FWS's five-year status review was not judicially reviewable final agency action.  See id. at 93-94.

Following this Court's decision, plaintiffs in the present case, who represent the forest products industry, petitioned FWS to delist the tri-state population of the murrelet.  See AR 2726-36.[1]  Relying primarily on the 2004 status review's conclusion that the tri-state population of the murrelet was not discrete, they argued that the listed DPS could not lawfully remain listed under the ESA.  See AR 2731, 2736.  In light of the agency's 2004 conclusion and the fact that it had not been formally revisited since that time, FWS found that the delisting petition presented "substantial information" indicating that the tri-state population of the murrelet "may not be discrete, and therefore may not meet the criteria for a DPS"; hence, it found that delisting "may be warranted."  73 Fed. Reg. 57,314, 57,316-17 (Oct. 2, 2008); see also 16 U.S.C. § 1533(b)(3)(A).  FWS noted, moreover, that it "now believe[d] that the discreteness analysis in the [2004] 5-year review was flawed."  Id. at 57,317.  The agency said that it would conduct another five-year status review and, once that was completed, make a finding on whether delisting the tri-state population of the murrelet was warranted.  Id.  FWS also stated its intent to "review the rangewide status of the species, and if necessary, the configuration and status of any distinct population segments."  Id. at 57,314.

FWS completed its second five-year status review in June 2009, concluding that the tri-state population of the murrelet was in fact "discrete," was "significant," and hence was a valid DPS under the 1996 DPS Policy.  See AR 8410.  Accordingly, FWS determined that delisting the murrelet was "not warranted."  See 75 Fed. Reg. 3424 (Jan. 21, 2010).  It is this "not warranted" decision that AFRC challenges in its first three claims for relief in this case.

---

[1] Also on the petition was Ron Stunzner.  AR 2726.

In September 2006, FWS published and sought comment on a proposed rule to revise the 1996 critical habitat designation "in response to [the 2003] settlement agreement." See 71 Fed. Reg. 53,838, 53,838 (Sept. 12, 2006). The agency proposed to designate 3,590,642 acres as critical habitat for the murrelet, but to exclude 3,368,950 of those acres under section 4(b)(2) of the ESA. Id. If adopted in its entirety, the proposed rule would have resulted in a designation of 221,692 acres in total. Id.

In March 2008, FWS published a notice stating that the critical habitat designation for the murrelet should not be revised "[d]ue to uncertainties regarding Bureau of Land Management (BLM) revisions to its District Resource Management Plans in western Oregon." 73 Fed. Reg. 12,067, 12,067 (Mar. 6, 2008). In July of that year, FWS published another proposed rule to revise critical habitat for the murrelet, this time by removing about 254,070 acres in California and Oregon. 73 Fed. Reg. 44,678 (July 31, 2008). In October 2011, FWS published a final rule removing about 189,671 acres in northern California and southern Oregon from the 1996 designation. 76 Fed. Reg. 61, 599 (Oct. 5, 2011).

AFRC filed suit in this Court in January 2012. See Compl. [ECF 1].

## STANDARDS OF REVIEW

### I.   APA Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case involving review of final agency action under the Administrative Procedure Act ("APA"), however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court

in reviewing the administrative record.  See Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F.

Supp. 2d 42, 52 (D.D.C. 2010) (citing Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C.

2006)), aff'd, 408 F. App'x 383 (D.C. Cir. 2010); see also Am. Bioscience, Inc. v. Thompson,

269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the

APA, the district judge sits as an appellate tribunal.  The entire case on review is a question of

law." (footnote and internal quotation marks omitted)).  Under the APA, it is the role of the

agency to resolve factual issues to arrive at a decision that is supported by the administrative

record, whereas "the function of the district court is to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did."

See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985).  Summary judgment thus

serves as the mechanism for deciding, as a matter of law, whether the agency action is supported

by the administrative record and otherwise consistent with the APA standard of review.  See

Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Plaintiffs challenge the decisions of FWS under the citizen suit provision of the ESA and

under the APA.  Because the ESA does not specify a standard of review for agency action, the

APA standard of review applies.  See AFRC II, 533 F. Supp. 2d at 89 (citing Nat'l Ass'n of Home

Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005)).  The APA requires that the Court "hold

unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The "scope

of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its

judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The Court must be satisfied that the agency has

"'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006).  The agency's decisions are entitled to a "presumption of regularity," Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," id. at 416.  Federal courts are particularly deferential towards the "'scientific determinations'" of the agency, which are "presumed to be the product of agency expertise." Franks v. Salazar, 816 F. Supp. 2d 49, 55 (D.D.C. 2011) (quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)) (alteration omitted).  The Court's review is confined to the administrative record, subject to limited exceptions not at issue here. See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## II.    Federal Consent Decrees

"Approving a consent decree 'is a judicial act,' and the Court undertakes it with care." United States v. Wells Fargo Bank, NA, 891 F. Supp. 2d 143 (D.D.C. 2012) (quoting United States v. Microsoft Corp., 56 F.3d 1448, 1462 (D.C. Cir. 1995)).  "[A] federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004).

Before approving a consent decree, a court must determine that it is fair and consistent

with the public interest.  See Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983).  The Court's duty is not to "inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy," but only to "determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties."  Id. (internal quotation marks omitted).  Generally it is not only the parties, but also the general public, that benefit from the time and monetary savings that result from voluntary settlements.  Id.

**DISCUSSION**

**I.    Motions for Summary Judgment**

The parties have cross-moved for summary judgment on AFRC's claims challenging FWS's decision that delisting the murrelet was "not warranted."  AFRC challenges that decision under the ESA and the APA on three grounds: first, that FWS failed to determine that murrelets in the tri-state DPS "interbreed when mature"; second, that FWS arbitrarily and capriciously determined that the tri-state DPS was "significant"; and third, that FWS arbitrarily and capriciously determined that the tri-state DPS was "discrete."

A.    "Interbreeds When Mature"

AFRC's first argument is that FWS did not determine that all murrelets in the DPS interbreed when mature, as required by the ESA, see 16 U.S.C. § 1532(16), and that FWS's failure to make this determination was arbitrary and capricious.  See Pls.' Mot. for Summ. J. [ECF 33] ("AFRC MSJ") 11-16.  According to AFRC, because it is undisputed that central California murrelets are genetically distinct from other murrelets in the DPS, the record before FWS "unequivocally" showed that the two groups do not interbreed.  See id. at 15.

FWS contends that AFRC waived this claim by failing to raise it during the administrative process.  As a general matter, "[a] party must first raise an issue with an agency before seeking judicial review."  ExxonMobil Oil Corp. v. FERC, 487 F.3d 945, 962 (D.C. Cir. 2007) (citing United States v. L.A. Trucker Truck Lines, Inc., 344 U.S. 33, 36-37 (1952)); see also Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1150 (D.C. Cir. 2005) ("[A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration.").  This doctrine – interchangeably termed "issue exhaustion" and "issue waiver" – does not represent an "ironclad rule" and ordinarily is not a "jurisdictional prerequisite to judicial review."  See Advocates, 429 F.3d at 1148-49 (citing, inter alia, Sims v. Apfel, 530 U.S. 103 (2000)).  But given the narrow scope of review of agency action and for reasons of "simple fairness" to the agency, courts typically require arguments advanced in court to have been raised first before the agency.  See ExxonMobil, 487 F.3d at 962; see also Koretoff v. Vilsack, 707 F.3d 394, 398 (D.C. Cir. 2013) (per curiam).

AFRC argues that "issue exhaustion" does not limit the Court's review of its claims because it is suing under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), and that provision's 60-day notice requirement displaces all other exhaustion requirements.  See Pls.' Reply & Opp'n [ECF 41] ("AFRC MSJ Reply") 1, 7.  AFRC cites four decisions from courts outside this circuit for the proposition that giving 60-day notice is the sole exhaustion requirement for an ESA claim; it also cites eight additional decisions purportedly holding that the 60-day notice requirements in other environmental citizen suit provisions similarly "override any

prudential exhaustion requirement[s]."  See id. at 7-8.[2]  The Court has reviewed the cases cited

by AFRC.  Collectively, these cases focus on exhaustion of administrative remedies rather than

the judicially created doctrine of issue exhaustion.  See, e.g., Wash. Toxics, 413 F.3d at 1033

(finding no "suggest[ion] of any legislative intent to require exhaustion of the FIFRA remedy

before seeking relief under the ESA"); Coal. for Sustainable Res., 48 F. Supp. 2d at 1312 & n.6

(plaintiff suing under ESA citizen suit provision was not required to go through "administrative

adjudication process"); Ky. Heartwood, 20 F. Supp. 2d at 1091 (stating that "exhaustion of

administrative remedies is not a mandatory precondition to filing suit for a violation of the ESA"

(emphasis added)); Silver, 924 F. Supp. at 987 (60-day notice in ESA citizen suit provision

excuses plaintiffs from having to exhaust administrative remedies prescribed in agency's

regulations); see also Sims, 530 U.S. at 112 (recognizing that issue exhaustion requirement and

requirement exhaustion of remedies are different).

   To the extent that AFRC is arguing that it did not have to avail itself of additional

administrative procedures before bringing a citizen suit under the ESA, the Court fully agrees.

See 16 U.S.C. § 1540(g); see also id. § 1533(b)(3)(B)(i), (C)(ii) (a finding that petitioned action

---

[2] The four ESA cases are: Wash. Toxics Coal. v. EPA, 413 F.3d 1024 (9th Cir. 2005);
Coal. for Sustainable Res., Inc. v. U.S. Forest Serv., 48 F. Supp. 2d 1303 (D. Wyo. 1999), aff'd in
part, vacated in part, 259 F.3d 1244 (10th Cir. 2001); Ky. Heartwood, Inc. v. Worthington, 20 F.
Supp. 2d 1076 (E.D. Ky. 1998); Silver v. Babbitt, 924 F. Supp. 976 (D. Ariz. 1995).  The eight
additional cases are: Blue Legs v. U.S. Bureau of Indian Affairs, 867 F.2d 1094 (8th Cir. 1989);
Ass'n of Irritated Residents v. Fred Schakel Dairy, No. 05-707, 2008 WL 850136 (E.D. Cal.
2008); Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., 531 F. Supp. 2d 747 (S.D. W. Va.
2008); Swartz v. Beach, 229 F. Supp. 2d 1239 (D. Wyo. 2002); Cmtys. for a Better Env't v.
Cenco Refining Co., 180 F. Supp. 2d 1062 (C.D. Cal. 2001); Am. Canoe Ass'n v. EPA, 30 F.
Supp. 2d 908 (E.D. Va. 1998); Culbertson v. Coats Am., Inc., 913 F. Supp. 1572 (N.D. Ga.
1995); Middlesex Cnty. Bd. of Chosen Freeholders v. N.J. Dep't of Envtl. Prot., 645 F. Supp. 715
(D.N.J. 1986).  AFRC MSJ Reply 8-9.  AFRC relied on these cases not only in its briefing but
also at the motions hearing.

is "not warranted" is subject to judicial review).  AFRC gave FWS 60 days notice of its intent to

sue to remedy the agency's alleged violations of the ESA, including the denial of AFRC's

delisting petition.  Hence, AFRC fulfilled its exhaustion obligation under § 1540(g) and did not

have to pursue any further administrative remedies after FWS issued its "not warranted" decision.

But § 1540(g) does not obviously preclude the imposition of an issue exhaustion

requirement.  The Court does not interpret the cases cited by AFRC to do so either, and even

assuming that one or more of those cases intended to address issue exhaustion and not just

exhaustion of administrative remedies, none offers a persuasive rationale as to why issue

exhaustion should not apply in an ESA citizen suit.  Indeed, a primary purpose of issue

exhaustion is to prevent courts from "'review[ing]' a substantive claim that has never even been

presented to the agency for its consideration," see Advocates, 429 F.3d at 1150, and the purpose

of the 60-day "notice" requirement is similar: to put the agency on notice of the alleged statutory

violation so that it may have an opportunity to remedy it.  Several of the cases relied on by AFRC

recognize this purpose.  See, e.g., Ky. Heartwood, 20 F. Supp. 2d at 1091 ("The purpose of the

sixty (60) day notice requirement is to give the offending agency an opportunity to cure the

alleged illegality."); Silver, 924 F. Supp. at 987 (same); Am. Canoe Ass'n, 30 F. Supp. 2d at 922

n.16 ("Given the plaintiffs' compliance with the 60-day notice provision, which gave EPA actual

notice of the claims and time in which to act upon them, they have exhausted all administrative

procedures required or available under the Clean Water Act."); Culbertson, 913 F. Supp. at 1578

("The sixty-day notice provision allows the agency to act prior to federal court involvement, thus

serving as a statutory exhaustion requirement.").  In the Court's view, however, the ESA's 60-day

notice requirement does not relieve a party of its obligation to tell the agency what it is the party

14

thinks the agency did wrong.  If anything, it reinforces that obligation.

Moreover, AFRC states that "[i]f [its] claims in this case were based on the judicial review provisions of the APA, there would likely be an issue exhaustion requirement."  AFRC MSJ Reply 6.  Yet its claims in this case are based in part on the APA, see, e.g., Compl. ¶¶ 31-46 (alleging claims under APA, 5 U.S.C. § 706(2)), and its ESA claims are governed by the judicial review provisions of the APA, see Home Builders, 415 F.3d at 13 ("There exists no statutory review provision in the ESA that authorizes judicial review of agency action beyond that provided for in the APA." (citing Cabinet Mountains Wilderness v. Peterson, 685 F.3d 678, 685 (D.C. Cir. 1982)).  Therefore, the fact that issue exhaustion is an APA doctrine does not mean it cannot apply here.

The Court recognizes, nonetheless, that the application of issue exhaustion will depend on the particular administrative context.  See Advocates, 429 F.3d at 1148.  As the Supreme Court said in Sims v. Apfel: "The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts."  530 U.S. at 108-09.  AFRC stresses, correctly, that issue exhaustion is most appropriate "[w]here the parties are expected to develop the issues in an adversarial administrative proceeding."  See AFRC MSJ Reply 14 (quoting Sims, 530 U.S. at 110).  But it can also be appropriate where the administrative proceeding is non-adversarial.  The D.C. Circuit has applied issue exhaustion numerous times where the underlying proceeding was an agency rulemaking. See Advocates, 429 F.3d at 1148-50 (rejecting argument that "it is inappropriate [under Sims] to apply the general principles of issue waiver to administrative rulemaking"); see also, e.g., Koretoff, 707 F.3d at 398-99; Nat'l Mining Ass'n v. Dep't of Labor, 292 F.3d 849, 874 (D.C. Cir.

15

2002); Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 562 (D.C. Cir. 2002) (per curiam) ("We decline to reach the merits of NWF's cost estimate challenges because neither NWF nor any other party before the agency raised any of these contentions during the administrative phase of the rulemaking process.").

Here, the administrative process preceding the challenged "not warranted" decision was neither adversarial nor a notice-and-comment rulemaking. See 16 U.S.C. § 1533(b)(3)(A)-(B). AFRC asserts that because of the nature of the administrative process, it did not have the public participation rights associated with a standard rulemaking. For example, there was no proposed "not warranted" decision or even a formal public comment period, and FWS did not publish any response to the comments it did receive. See AFRC MSJ Reply 14-15. Hence, AFRC argues that the case for issue exhaustion is weak in this context.

This argument has some persuasive force. If, because of the nature of the administrative process, AFRC did not have a reasonable opportunity to present its "interbreeds when mature" argument to FWS in the first instance, then it would be unfair to refuse to consider it here on that basis. See CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1079 (D.C. Cir. 2009) (not imposing issue exhaustion requirement where party "had no way to raise [its] argument until the Board issued its final rule"). If, however, AFRC could have presented its "interbreeds when mature" argument but failed to alert the agency to that issue, then FWS "cannot be faulted for failing to address [the] issue[]." See Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001). The Court therefore looks to the series of events surrounding AFRC's delisting petition and the "not warranted" decision.

AFRC submitted its delisting petition after, and in reliance on, the 2004 status review's

conclusion that the tri-state DPS was not discrete.  It is no surprise that AFRC's delisting petition focused on that issue.  See AR 2731-36.  Then, in FWS's 90-day finding that delisting "may be warranted," the agency stated that its discreteness analysis in 2004 had been flawed.  73 Fed. Reg. at 57,317.  In light of this statement, it was no longer reasonable for AFRC to simply rely on the 2004 status review as a sufficient basis for delisting the murrelet.  Accordingly, AFRC submitted a comment in which it argued that the tri-state DPS was neither discrete nor significant.  See AR 2738-46.  At that time, it would have been entirely appropriate, and AFRC had ample opportunity, to raise any other arguments attacking the validity of the tri-state DPS. But nowhere in its comment did AFRC make the "interbreeds when mature" argument it now makes here.

FWS then issued the 2009 five-year status review and the "not warranted" finding on AFRC's petition.  Despite AFRC's assertion that FWS "conducted the entire status review behind closed doors" and "simply announced the result at the conclusion of the process," FWS's approach did not prevent AFRC from arguing that central California murrelets do not "interbreed when mature" with other murrelets in the tri-state DPS.  See AFRC MSJ Reply 14.  The result announced – that the tri-state population of the murrelet was a valid DPS – was nothing new; the tri-state DPS had been listed since 1992.  Compare CSX Transp., 584 F.3d at 1079 (concluding that petitioner had "no way to raise" argument before final rule issued because final rule included change not indicated in proposed rule).

Finally, AFRC's 60-day notice, given after the administrative process was complete, still did not explicitly raise the "interbreeds when mature" issue.  Although the notice contains language taken from the ESA's definition of "species," which includes the words "interbreeds

when mature," 16 U.S.C. § 1532(16), the notice does not in any way draw attention to these words and hence was insufficient to preserve the issue.  While agencies must ensure that their decisions meet statutory requirements, they "have no obligation to anticipate every conceivable [statutory] argument" that could be made.  See Koretoff, 707 F.3d at 398 (rejecting argument that "the Secretary was 'obligated under the APA to address [his] statutory authority sua sponte,' whether 'raised by a commenter or not'"); see also State Farm, 463 U.S. at 51 (stating that a rulemaking "'cannot be found wanting simply because the agency failed to include every alternative . . . thought conceivable by the mind of man'" (quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 551 (1978)); Ohio v. EPA, 997 F.2d 1520, 1528-29 (D.C. Cir. 1993) (finding argument that rule violated statute was waived).

Because AFRC did not raise the specific "interbreeds when mature" issue in its petition, its comments to the agency, or its 60-day notice, the issue was waived.  Hence, FWS did not act arbitrarily or capriciously by failing to make an explicit "interbreeds when mature" determination.  See Advocates, 429 F.3d at 1150.

B.    Significance

This is not the end of the "interbreeds when mature" inquiry, however.  AFRC also contends that FWS's "significance" determination was arbitrary and capricious.  FWS found that the tri-state population of murrelets was significant because its loss would result in (1) a significant gap in the range of the murrelet and (2) the loss of unique genetic characteristics that are significant to the taxon.  See AR 7.  Both of these conclusions, however, rest on the inclusion

of central California murrelets in the DPS.[3]  According to FWS, the resulting gap would be

"significant" because the Washington, Oregon, and California area accounts for about 18 percent

of the murrelet's coastal distribution, spanning 17 degrees of latitude, and is located at the

southernmost extent of the murrelet's range.  See id.  But if central California murrelets were

excluded from the DPS, then the tri-state area would account for only about 10 percent of the

murrelet's coastal distribution and 9 degrees of latitude and would not be at the southernmost

extent of the range.  See AFRC MSJ 18.  That might undercut FWS's first basis for its

significance determination.  Similarly, the "unique" genetic characteristics cited by FWS are the

genetic characteristics of central California murrelets.  Excluding these murrelets from the DPS

would eliminate this second rationale for finding the tri-state population significant.  See AR 7

("Since the currently listed population encompasses all of one genetic unit as mentioned above

[central California murrelets] and a portion of another [murrelets from the eastern Aleutian

islands to northern California], loss of the population could compromise the long-term viability

of the species as a whole."); see also id. (stating that "there is no genetic distinction at the [U.S.-

Canada] border").

     AFRC argues that the inclusion of central California murrelets in the DPS fatally

"taint[s]" the significance determination.  See AFRC MSJ 17.  Although AFRC argued that the

tri-state population was not significant in its comment in support of delisting, it did not raise this

---

[3] In its discussion of significance, FWS also noted that the tri-state DPS contains "an
ecologically distinct forest system, the coastal redwood zone."  AR 7.  This fact might help
support an otherwise-justified finding of significance.  But if central California murrelets should
not have been included in the DPS, and FWS's two primary conclusions therefore no longer held,
then the mere presence of an ecologically distinct forest system would be insufficient, on its own,
to support FWS's significance finding.  FWS has not argued to the contrary.

particular argument – that in assessing significance, FWS could not properly consider central California murrelets as part of the DPS because they do not interbreed with Washington, Oregon, and northern California murrelets.  See AR 2744-46.  Hence, FWS makes a plausible argument that AFRC forfeited its opportunity to challenge the significance determination on this basis.  See Def.'s Cross-Mot. for Summ. J. & Opp'n [ECF 38] ("FWS Cross-Mot.") 34; see also Advocates, 429 F.3d at 1150.

But even if the Court were to find this particular argument waived, it would nevertheless have to review FWS's significance determination based on the evidence in the record.  A problem with doing that, however, is that the "interbreeds when mature" issue underlies the significance determination.  Counsel for FWS conceded as much at the motions hearing.  To fairly evaluate the significance determination, the Court would have to consider the reasonableness of including in the DPS a population of murrelets that is genetically distinct from other murrelets in the DPS, and of relying on those murrelets' genetic distinctiveness in finding the DPS significant.  In this way, the Court would reach the "interbreeds when mature" issue.  Even though that specific issue was not raised, then, the Court could not overlook that the record contains undisputed evidence of the central California murrelets' genetic distinctiveness and even the suggestion by AFRC (albeit in a different context) that the "three genetic entities" should be recognized as "separate DPSs," id. at 7, 2765;[4] see also id. at 2731-32 (AFRC delisting petition noting U.S. Geological Survey finding that "the central California portion of the listed Three-State DPS is discrete from

--------

[4] The three genetic entities referred to are (1) the central California subunit, (2) the Aleutian subunit, and (3) the Alaska, Canada, Washington, Oregon, and northern California subunit.  AR 2765.  AFRC suggested that these entities be recognized as separate DPSs in arguing that the tri-state area was not "a significant portion of [the murrelet's] range."  See 16 U.S.C. § 1532(20); AR 2765.

the rest of the listed DPS").  If the genetic distinctiveness of the two populations comprising the tri-state DPS means that they do not interbreed when mature, then FWS's significance determination cannot be upheld.  See 16 U.S.C. § 1532(16); see also Modesto Irrigation Dist. v. Gutierrez, 619 F.3d 1024, 1032 (9th Cir. 2010) (accepting NMFS's position that "interbreeding is a necessary, but not a sufficient condition for classification as a DPS").

AFRC asserts that two populations of a species cannot be genetically distinct yet interbreed when mature.  FWS asserts that genetic distinctiveness does not equate to a failure to interbreed.  Intervenors go so far as to say that it is "self-evident" that the two murrelet populations in the tri-state DPS do interbreed, at least on an evolutionary time scale.

Resolution of this issue may be straightforward.  But on this record, the Court is simply not equipped to evaluate the parties' dueling propositions of biology.  All agree that FWS has not yet made an "interbreeds when mature" determination.  That task is for the agency, which, unlike the Court or the parties' lawyers, has expertise in biology.  See Pub. Citizen v. Fed. Motor Carrier Safety Admin., 374 F.3d 1209, 1218 (D.C. Cir. 2004) ("The expertise of the agency, not its lawyers, must be brought to bear on this issue in the first instance.").  The answer may in fact be "self-evident" to a biologist, but the question is not one for the Court.  Accordingly, the Court will remand the significance determination to FWS for the limited purpose of determining whether central California murrelets "interbreed when mature" with other murrelets in the DPS (and the impact of that determination on the significance determination).  This remedy both "ensures 'simple fairness' to the agency" and will give this Court a record on the issue to "review."  See ExxonMobil, 487 F.3d at 962; Advocates, 429 F.3d at 1150 ("[I]t is unsurprising that parties rarely are allowed to seek 'review' of a substantive claim that has never even been

presented to the agency for its consideration.").

C.     Discreteness

AFRC's final challenge is to FWS's determination that the tri-state DPS was "discrete."
Under the 1996 DPS Policy, a population segment may be considered discrete if it is either
(1) "markedly separated from other populations of the same taxon as a consequence of physical,
physiological, ecological, or behavioral factors," or (2) "delimited by international governmental
boundaries within which differences in control of exploitation, management of habitat,
conservation status, or regulatory mechanisms exist that are significant in light of section
4(a)(1)(D) of the Act."  61 Fed. Reg. at 4722.  In the "not warranted" decision, FWS found no
evidence of genetic or "morphological" separation between murrelet populations across the U.S.-
Canada border, nor did it find differences in control of exploitation.  AR 3.  FWS did, however,
find significant differences in management of habitat, conservation status, and regulatory
mechanisms between the United States and Canada.  Id.

AFRC raises numerous objections to FWS's discreteness determination.  The Court notes
that AFRC bears a "heavy burden" in advancing its claim that FWS misapplied the discreteness
criterion of its DPS Policy, because "the agency's interpretation of its own regulations 'must be
given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"  In re
Polar Bear Endangered Species Act Listing & 4(d) Rule Litig., Nos. 11-5219, 11-5221, 11-5222,
11-5223, 2013 WL 765059, at *10 (D.C. Cir. Mar. 1, 2013) (quoting Thomas Jefferson Univ. v.
Shalala, 512 U.S. 504, 512 (1994)).  AFRC's three principal arguments are (1) that FWS did not
adequately explain its finding that there was a difference in conservation status between the
United States and Canada; (2) that FWS did not rationally alter its approach to comparing

22

regulatory mechanisms across the border; and (3) that FWS's comparison of U.S. and Canadian regulatory mechanisms was contrary to the record and inadequately explained.  None of these arguments persuades the Court that FWS's decision on discreteness was arbitrary and capricious.

First, AFRC challenges FWS's conclusion that there was a significant difference in the conservation status of the murrelet between the United States and Canada.  FWS relied on four factors in reaching its conclusion: first, the murrelet population in the United States is smaller than in Canada (the U.S. population is less than one-third of the Canadian population);[5] second, the productivity of murrelets is lower in the United States than in Canada; third, the loss of old-growth forests – prime murrelet habitat – has been more severe in the United States than in Canada in recent years; and fourth, the absolute amount of murrelet nesting habitat is smaller in the United States than in Canada.  AR 3-4.  FWS also noted that the existing difference in conservation status would likely be exacerbated if the murrelet no longer had the benefit of ESA listing.  AR 4.

AFRC contends that FWS did not adequately explain why these four factors led it to conclude that there were significant differences in conservation status.  But the agency's reasoning is clear enough to the Court.  The U.S. population of murrelets, even with the Act's protections, is smaller, less productive, and losing suitable habitat faster than the Canadian population of murrelets.  Hence, in FWS's expert judgment, the more imperiled U.S. population was sufficiently distinct from its Canadian counterpart to support a discreteness finding.  The agency provided "'a rational connection between the facts found and the choice made.'"

---

[5] AFRC's claim that FWS "did not report the [population] numbers correctly" is wholly without merit.  See AFRC MSJ 27.  Compare AR 3, with AR 4415, 8414.

Alpharma, 460 F.3d at 6.  Hence, no further explanation was required.[6]

Second, AFRC contends that FWS arbitrarily and capriciously changed its approach to comparing U.S. and Canadian regulatory mechanisms.  In the 2004 status review, FWS compared existing regulatory mechanisms in Canada to existing (i.e., "with listing") regulatory mechanisms in the United States.  In the 2009 status review, which FWS relied on in the "not warranted" decision, FWS compared existing regulatory mechanisms in Canada to non-ESA (i.e, "without listing") regulatory mechanisms in the United States.  In the "not warranted" decision, FWS stated its belief that the "with listing" approach used in 2004 was "fundamentally flawed" and that a "without listing" approach ensured consistency across its listing and delisting decisions in the way discreteness was analyzed.  AR 2-3.  FWS explained that "[a]t the time of an initial listing determination, a species does not yet have the Act's protection, so an analysis for discreteness based on an international border would compare any regulatory mechanisms on the

_____

[6] AFRC also argues that FWS did not explain its conclusion in light of its prior statement in the 2004 five-year status review that "there is no accepted protocol by which these statistics yield a meaningful comparison of conservation status across the border for purposes of the DPS policy."  AFRC MSJ 28 (quoting AR 8383).  First, this 2004 statement does not make FWS's 2010 conclusion any less rational.  Second, as FWS and intervenors point out, the quoted statement is of questionable validity, as it may have been added to the 2004 status review at the last minute due to improper political influence.  See FWS Cross-Mot. 13 n.3; Intervenors' Cross-Mot. for Summ. J. & Opp'n [ECF 39] ("Intervenors' Cross-Mot.") 25.  Compare AR 8383 (2004 5-Year Review), with AR 3736 (4/21/04 Draft 5-Year Review).

Julie MacDonald, former Deputy Assistant Secretary for Wildlife and Parks at the Department of the Interior, was found to have improperly used her influence to modify a number of FWS decisions during her tenure.  See Intervenors' Cross-Mot. 11; AR 3752-53.  One such decision was the 2004 five-year status review for the marbled murrelet.  See AR 3753.  Apparently, reviewers at a regional office of FWS at first determined that the tri-state population of the murrelet was discrete, but, due to MacDonald's influence, that determination was reversed in the final status review.  AR 3736-37, 3753.  MacDonald's improper influence on the 2004 status review may help to explain the change in FWS's discreteness analysis between 2004 and 2009-2010.

24

foreign side of the border with any non-Act regulatory mechanisms that exist in the United States."  Id. at 8401.  To evaluate a petition for delisting, the agency would similarly compare foreign regulatory mechanisms to non-Act regulatory mechanisms in the United States.  That way, a population segment's "discreteness" does not depend on its current listing status, and discreteness means the same thing in the context of listing and delisting determinations alike.  FWS sufficiently explained its reasons for changing its approach.  See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514-15 (2009).[7]

Finally, AFRC raises a host of challenges to FWS's conclusion that the differences between U.S. and Canadian regulatory mechanisms were sufficiently significant to support a discreteness finding.  In the "not warranted" decision, FWS discussed in detail the regulatory mechanisms in Canada giving protection to the murrelet, including the Species at Risk Act ("SARA"), the Canadian federal endangered species law,[8] the Federal Migratory Birds Convention Act ("MBCA"), the British Columbia Wildlife Act, and the British Columbia Forest and Range Practices Act; FWS then discussed as well the regulatory mechanisms in the United States that would protect the murrelet if it were delisted, including the Migratory Bird Treaty Act

---

[7] AFRC cites several other listing decisions in which it claims FWS used the "with listing" approach.  In three of these, involving the gray wolf, FWS noted that in the United States, unlike in Canada, federal protection has been necessary to recover the wolf.  See AFRC MSJ 30.  But this statement could be interpreted as saying that without federal protection, the two populations are different (indicating a "without listing" approach).  And moreover, in each of these decisions, FWS also stated: "If delisted, [states in the DPS] would carefully monitor and manage to retain populations at or above the recovery goal" – a "without listing" comparison.  See 76 Fed. Reg. 81,666, 81,672 (Dec. 28, 2011); 76 Fed. Reg. 26,086, 26,103 (May 5, 2011); 74 Fed. Reg. 15,123, 15,129 (Apr. 2, 2009).  The fourth decision took place in 2006, long before the determinations at issue here, and is not relevant.

[8] The murrelet is classified as a "threatened" species under SARA.

25

("MBTA"), which is similar to Canada's MBCA, state laws in Washington, Oregon, and California, and the Northwest Forest Plan.  AR 3-6.  Comparing the two sets of protections, FWS concluded that if the tri-state population of the murrelet were delisted, it would receive "significantly less regulatory protection" in the United States than in Canada.  AR 4-6.

AFRC argues that this conclusion is flawed because FWS failed to consider the "actual effect" of Canadian laws on the murrelet.  It points to FWS's determination that SARA is more protective than the MBTA because the MBTA, which prohibits "take" of murrelets, does not prohibit habitat destruction, whereas SARA, by contrast, prohibits "harm, harassment, and destruction of the species' 'residence.'"  AR 5.  AFRC makes a "record-based biology" argument that SARA's prohibition against destruction of a species' residence has little real-world effect, asserting that SARA's protection extends only to trees that are "occupied or habitually occupied" by a murrelet,[9] but that murrelet nest sites are extremely difficult to locate (as of 2004 only 123 had been located in Canada), and hence SARA really only protects a handful of Canadian trees.  AFRC MSJ 32-36.  Assuming that AFRC is correct that the scope of "residence" protection under SARA is narrow, this particular provision of Canadian law lends only weak support for FWS's ultimate conclusion that Canadian law provides greater protection that U.S. law.  But the Court does not find that it was arbitrary or capricious for FWS to note that SARA extends a protection to murrelets that, however limited it might be in practice, does not exist in non-ESA U.S. law.  The fact remains that, if the tri-state population of the murrelet were delisted, then

---

[9] As FWS explained in the "not warranted" decision: "SARA defines the 'residence' of a species to mean 'a dwelling-place, such as a den, nest or other similar area or place, that is occupied or habitually occupied by one or more individuals during all or part of their life cycles, including breeding, rearing, staging, wintering, feeding or hibernating.'  Hence, to receive SARA's protection, a 'residence' need not be continuously occupied by the species."  AR 4.

murrelets in Canada would receive all federal protections afforded to them under SARA, while murrelets in the United States would have none of the federal protections currently afforded to them under the ESA.[10]  As relatively minor differences may be significant in the aggregate, FWS permissibly discussed all differences between the regulatory mechanisms it identified.

Accordingly, the Court does not find that FWS acted arbitrarily or capriciously by noting that SARA imposes significantly greater penalties (felony-level sanctions of up to 5 years' imprisonment and/or $250,000 fines for an individual or $1,000,000 for a corporation) than does the MBTA (misdemeanor penalties of up to 6 months' imprisonment and/or $15,000 in fines). See AR 4-5.  Although FWS did not determine the actual deterrent impact of the two penalty schemes, as AFRC urges it had to do, see AFRC MSJ 37-38, the differences between the schemes on paper  – a tenfold difference in potential jail time and a more-than-$200,000 difference in potential fines – are significant enough to merit mention.

AFRC also argues that FWS erroneously determined that if the tri-state population were delisted, murrelets in Washington would not be protected from "bycatch," as Washington's current protections are tied to the ESA.  See AFRC MSJ 38 (citing AR 6).  AFRC asserts that FWS overlooked the MBTA, which would continue to protect murrelets in Washington from bycatch through its prohibition on taking, capturing, and killing migratory birds.  Id.  As FWS does not respond to this argument, the Court will not assume that delisting would result in a difference in bycatch protections across the border.  That FWS may have misstated this minor difference does not render its overall conclusion arbitrary and capricious, however.

---

[10] FWS analyzed this as a difference in conservation status and found it to be a significant one.  AR 3.  But in the Court's view, a difference in listing status is more properly viewed as a difference in regulatory mechanisms attendant to listing.

AFRC additionally argues that FWS's discreteness determination was arbitrary and capricious because FWS allegedly failed to consider several important conservation measures in the United States, including the National Forest Management Act ("NFMA"), the Federal Land Policy and Management Act ("FLPMA"), ESA protections to other listed species (in particular, the northern spotted owl) that would incidentally protect the murrelet, and the Northwest Forest Plan.  FWS <u>did</u> consider the Northwest Forest Plan, however.  <u>See</u> AR 6.  It noted that if the murrelet were delisted, then the Plan could be amended to reduce protection for the species, but that the murrelet "would still derive some incidental benefit" from the Plan's provisions.  <u>Id.</u>  This did not amount to a failure to consider the Northwest Forest Plan.  As to the NFMA, the FLPMA, and the listing of other species under the ESA, FWS did not explicitly discuss these measures in the "not warranted" decision.  But in an appendix to the 2009 five-year status review, which formed the basis for FWS's "not warranted" decision, FWS listed the NFMA and the FLPMA among the laws and regulations it considered "in the evaluation of existing regulatory mechanisms" for the review.  AR 3, 8486, 8496-97.  Thus, it appears that these statutes were considered.  A discussion of any incidental conservation benefits flowing from another species' listing might have slightly enhanced FWS's analysis, but it was not required for FWS's determination to be rational.  More importantly, AFRC has not indicated how the NFMA, the FLPMA, or another species' listing status would provide more protection to the murrelet than the measures FWS did consider, most notably the Northwest Forest Plan, or how consideration of these measures might have impacted FWS's decision.  Therefore the Court will not deem FWS's failure to discuss these measures arbitrary and capricious.

Finally, AFRC argues that FWS "irrationally faulted" non-ESA regulatory mechanisms in

the United States for lacking a protective measure – the ESA's section 7 consultation requirement – that is equally lacking in Canada.  AFRC MSJ 41 (citing AR 5).  That FWS noted the ESA protections that would be lost through delisting is not itself arbitrary and capricious.  In determining whether the tri-state DPS was discrete, so as to warrant remaining listed, FWS was not forbidden from discussing the protections conferred by the ESA.

In summary, AFRC has stated numerous reasons why it believes FWS was wrong in concluding that the tri-state DPS was discrete.  The Court agrees that the record here might support more than one conclusion, but the conclusion drawn by the agency did not have to be the only, or even the best, conclusion supported by the record.  The agency's decision only had to be rational, and in this case it was.  FWS's finding of a significant difference in the conservation status of a species is a "scientific determination" to which the Court owes particular deference.  See Baltimore Gas, 462 U.S. at 103; Cytori Therapeutics, Inc. v. FDA, Nos. 11-1268, 11-1279, 2013 WL 1164775, at *5 (D.C. Cir. Mar. 22, 2013) ("A court is ill-equipped to second-guess that kind of agency scientific judgment under the guise of the APA's arbitrary and capricious standard.").  Here that finding was well supported by the evidence cited.  See AR 3-4.  Aspects of FWS's findings on the differences in regulatory mechanisms and management of habitat could perhaps have been better explained, but it is clear that FWS thoroughly examined the relevant regulatory mechanisms in both the United States and Canada, thoughtfully considered the differences that would exist if the murrelet were delisted, and rationally reached the conclusion that those differences were significant in light of section 4(a)(1)(D) of the ESA.  See State Farm, 463 U.S. at 43 (stating that court "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned'"); AR 6.  Despite AFRC's many objections, nothing in the record

29

suggests that the agency's decision was "'plainly erroneous or inconsistent with' the DPS Policy." See In re Polar Bear, 2013 WL 765059, at *11 (quoting Thomas Jefferson, 512 U.S. at 512). Hence, the Court concludes that FWS's discreteness determination was not arbitrary and capricious.

## II.    **Motion for Entry of a Consent Decree**

AFRC and FWS have jointly moved for entry of a proposed consent decree and dismissal with prejudice of AFRC's fourth, fifth, sixth, and seventh claims for relief, all of which challenge the designation of critical habitat for the murrelet.  Pursuant to the proposed consent decree, and in exchange for the dismissal of AFRC's claims, the 1996 critical habitat designation, as revised in 2011, would be vacated and remanded to FWS for a new rulemaking; FWS would submit a proposed revised rule by September 30, 2017, and a final revised rule by September 30, 2018. See Proposed Consent Decree [ECF 25-2] 3.  Intervenors oppose entry of the proposed consent decree and argue that the Court should deny the joint motion for three reasons.  First, intervenors contend that the Court lacks jurisdiction to enter the proposed consent decree because AFRC's claims to be resolved by the decree are barred by the statute of limitations.  Second, they urge that the proposed consent decree should be rejected because it would allow the parties to do through a consent decree what they could not otherwise do under the APA.  Finally, intervenors argue that the proposed consent decree is not fair, reasonable, or in the public interest.  The Court will address each argument in turn.

### A.    Jurisdiction

Intervenors contend that the Court does not have jurisdiction to enter a consent decree resolving AFRC's 2012 challenges to FWS's 1996 critical habitat designation because those

challenges are barred by the six-year statute of limitations set by 28 U.S.C. § 2401(a).  Section

2401(a) is a "catch-all statute of limitations for non-tort civil claims against the United States."

Price v. Bernanke, 470 F.3d 384, 387 (D.C. Cir. 2006).  The D.C. Circuit has held that § 2401(a)

is jurisdictional.  See P & V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021, 1026 (D.C.

Cir. 2008); Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987).  Although AFRC

argues, not unreasonably, that recent authority suggests that § 2401(a) is not jurisdictional, see

Pls.' Reply in Supp. of Joint Mot. for Entry of Consent Decree [ECF 32] ("AFRC CD Reply")

(citing Gonzalez v. Thaler, 132 S. Ct. 641 (2012), and other cases), this Court concludes, as it

has previously, that it is bound to follow this circuit's precedent.  See Howard v. Blank, No. 05-

1968, 2012 WL 4096370, at *3 (D.D.C. Sept. 19, 2012); W. Va. Highlands Conservancy v.

Johnson, 540 F. Supp. 2d 125, 143 (D.D.C. 2008).  In any case, the result here does not depend

on whether § 2401(a) is jurisdictional because, as discussed below, the Court concludes that

AFRC's claims are not time-barred by § 2401(a).

It is helpful to start with a description of AFRC's critical habitat claims.  AFRC's Fourth

Claim asserts that FWS unlawfully designated critical habitat that was not "occupied" by the

marbled murrelet at the time of listing in 1992.  See Compl. ¶¶ 47-50.  AFRC's Fifth Claim

asserts that by leaving in place the 1996 critical habitat designation in 2008, FWS failed to use

the best scientific and commercial data available, namely the scientific information relied on in

the 2006 proposed rule and a 2008 updated economic analysis.  See id. ¶¶ 51-55.  AFRC's Sixth

Claim asserts that FWS unlawfully designated critical habitat that did not contain physical or

biological features essential to the conservation of the murrelet.  See id. ¶¶ 56-60.  And AFRC's

Seventh Claim asserts that in 2011 FWS improperly expanded the designated critical habitat to

areas that do not contain physical or biological features essential to the conservation of the murrelet, and did so without providing notice and comment.  See id. ¶¶ 61-67.

Intervenors argue that these claims all challenge the 1996 designation and hence are time-barred.  AFRC responds that it is challenging FWS decisions made in 2008 and 2011 rather than in 1996.  See AFRC CD Reply 4.  As to AFRC's Fifth and Seventh Claims, the Court agrees. AFRC's Fifth Claim is directed at FWS's 2008 decision to leave the 1996 critical habitat designation unchanged, notwithstanding the agency's own updated scientific and economic analyses suggesting that the 1996 designation should be updated accordingly.  See Compl. ¶¶ 51-55.  AFRC's Seventh Claim is directed at a statement made by FWS in the 2011 rule revising critical habitat concerning areas within the boundaries of designated critical habitat that do not contain primary constituent elements.  See id. (quoting 2011 rule).  Thus, AFRC's Fifth and Seventh Claims are timely.

AFRC's Fourth and Sixth Claims, on the other hand, appear to be directed at the 1996 rule.  These claims challenge the designation of allegedly unoccupied critical habitat and the designation of critical habitat that allegedly does not contain primary constituent elements.  See Compl. ¶¶ 47-50, 56-60.  The only designation of critical habitat took place in 1996.  In 2006, the agency proposed a revision to the 1996 designation; in 2008, the agency decided not to make that revision; and in 2011, the agency made a narrow revision to remove certain areas from the designation.  Hence, the Court is not persuaded by AFRC's contention that its Fourth and Sixth Claims actually challenge FWS's 2008 and 2011 actions.

If those claims were time-barred, and the Court had jurisdiction over only AFRC's Fifth and Seventh Claims, then entry of the proposed consent decree might be problematic in light of

the Supreme Court's statement that a federal consent decree must "spring from, and serve to

resolve, a dispute within the court's subject-matter jurisdiction."  See Frew, 540 U.S. at 437.  The

Court recognizes that it "is not necessarily barred from entering a consent decree merely because

the decree provides broader relief than the court could have awarded after a trial," see Local No.

93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 525 (1986), but in the Court's

view, the resolution embodied in a proposed consent decree must match, to a reasonable degree

at least, the claims over which jurisdiction is proper.  See Frew, 540 U.S. at 437; cf. Sierra Club

v. Browner, Nos. 93-124, 93-125, 93-197, 93-564, 1994 WL 750290, at *3 (D.D.C. Sept. 20,

1994) (rejecting jurisdictional challenge to consent decree where court's jurisdiction over dispute

had not been challenged).  Here, the parties ask the Court to enter a consent decree that would

vacate the 1996 critical habitat designation, the form of relief that would most directly resolve

AFRC's Fourth and Sixth Claims challenging that designation.[11]  The propriety of entering the

proposed consent decree in the absence of jurisdiction over those claims seems questionable.

However, the Court need not decide this issue if, as FWS and AFRC contend, the Court

has jurisdiction over AFRC's Fourth and Sixth Claims by virtue of FWS's 2006-2008 reopening

of the 1996 rule.[12]  The reopening doctrine permits an otherwise time-barred challenge to agency

---

[11] If AFRC were to litigate and prevail upon just its Fifth and Seventh Claims, then the relief granted would not likely reach back to the 1996 rule.

[12] AFRC also argues, in brief, that the 2008-2011 revision to the murrelet critical habitat designation reopened the 1996 rule.  See AFRC CD Reply at 13, 18 n.3.  This is doubtful, given that FWS specifically declined to respond to comments outside the scope of the proposed revision to the critical habitat designation, which was limited to the removal of certain lands in California and Oregon and the change to the scientific name of the marbled murrelet.  See 76 Fed. Reg. at 61,600.  Regardless, whatever the merits of this argument, the Court need not consider it because the Court concludes that the 1996 rule was reopened during the 2006-2008 rulemaking process.

action to proceed where an agency "has in fact reopened" an existing rule in a later rulemaking.

See Pub. Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 150 (D.C. Cir. 1990).  The

doctrine is "designed to ensure that when the agency by some new promulgation creates the

opportunity for renewed comment and objection, affected parties may seek judicial review, even

when the agency decides not to amend the long-standing rule at issue."  P & V Enters., 516 F.3d

at 1024 (internal quotation marks and alteration omitted).  It applies where the "entire context"

shows that the agency "has undertaken a serious, substantive reconsideration of the existing rule."

Id. (internal quotation marks and alteration omitted); see also Nat'l Ass'n of Reversionary Prop.

Owners v. Surface Transp. Bd., 158 F.3d 135, 141 (D.C. Cir. 1998) ("We have said that when the

later proceeding explicitly or implicitly shows that the agency actually reconsidered the rule, the

matter has been reopened and the time period for seeking judicial review begins anew." (citing

Pub. Citizen, 901 F.2d at 150)).

    In this case, FWS proposed a revision to the 1996 critical habitat designation in 2006.

See 71 Fed. Reg. at 53,838.  The agency proposed to designate 3,590,642 acres as critical habitat

for the murrelet, but to exclude 3,368,950 of those acres under section 4(b)(2) of the ESA.  Id.;

see 16 U.S.C. § 1533(b)(2) (providing that, after taking into consideration all relevant impacts,

"[t]he Secretary may exclude any area from critical habitat if he determines that the benefits of

such exclusion outweigh the benefits of specifying such area as part of the critical habitat").  If

adopted in its entirety, the proposed rule would have resulted in a designation of 221,692 acres in

total.  Id.

    In arriving at the proposed designation, FWS reviewed available information on the

murrelet's habitat requirements and all known murrelet occurrences and studied numerous

articles and reports.  Id. at 53,843.  Much of this information post-dated the 1996 rule.  See id.  In

addition, FWS redetermined the PCEs for the murrelet, stating that these revised (but nearly

identical) PCEs were "more detailed" than the PCEs established in 1996 and were based on the

latest research.  See id.[13]  After explaining how it identified critical habitat for the murrelet, FWS

summarized the changes from the 1996 designation.  Id. at 53,846.  Reasons for the differences

included: the use of new information to determine areas essential to the conservation of the

species; the revision of PCEs to make them more detailed; the addition of areas known in 2006,

but not in 1996, to contain PCEs; the refinement of boundaries based on new studies showing

that murrelets likely did not nest as far inland as was thought in 1996; FWS's conclusion that late

successional reserves ("LSRs") designated through the Northwest Forest Plan could be

considered for exclusion under section 4(b)(2) of the ESA, based on a change in the agency's

policy for exclusion since 1996; and additional mapping refinements.  Id. at 53,846-47.

   FWS sought broad public comment on the proposed rule, specifying several particular

areas of interest including: "[t]he reasons any habitat should or should not be determined to be

critical habitat as provided by section 4 of the Act"; "the amount and distribution of marbled

murrelet habitat"; "what areas that were occupied at the time of listing that contain the features

that are essential for the conservation of the species should be included in our revised

---

   [13] In 2006, FWS determined the PCEs for the murrelet to be: "(1) Forested stands
containing large-sized trees, generally more than 32 inches (81 centimeters) in diameter with
potential nesting platforms at sufficient height, generally greater than or equal to 33 feet (10
meters) in height"; and "(2) The surrounding forested areas within 0.5 mi (0.8 km) of these stands
with a canopy height of at least one-half the site-potential tree height."  71 Fed. Reg. at 53,843.
In 1996, FWS had determined the PCEs to be: "(1) individual trees [generally more than 81
centimeters (32 inches) in diameter] with potential nesting platforms, and (2) forested areas
within 0.8 kilometers (0.5 miles) of individual trees with potential nesting platforms, and with a
canopy height of at least one-half the site-potential tree height."  61 Fed. Reg. at 26,264.

designation"; and "which habitat or habitat components (i.e., physical and biological features) are essential to the conservation of this species, and why." Id. at 58,838.

In 2008, FWS published a finding that the revision proposed in 2006 should not be made. 73 Fed. Reg. at 12,067. FWS said that this decision was "[d]ue to uncertainties regarding [BLM] revisions to its District Resource Management Plans in western Oregon," which would have "significant effects on future conservation of the [marbled murrelet]." Id. at 12,067-68. Although FWS noted that it would continue to consider the appropriateness of future revisions, it did not discuss the substance of either the 1996 rule or the 2006 proposed rule (or, for that matter, the updated economic analysis it had done in 2008). The agency merely concluded that it was not appropriate to revise critical habitat at that time and that, accordingly, the 1996 rule remained in effect. Id. at 12,068.

The parties dispute whether FWS's 2006-2008 actions reopened the 1996 critical habitat designation. Intervenors contend that FWS did not reopen the proposed rule. They label FWS's 2008 decision not to make the revision proposed in 2006 as an "abandonment" of the proposed revision, and argue that merely proposing and then "abandoning" a new rule is insufficient to constitute a reopening. See Intervenors' Opp'n to Proposed Consent Decree [ECF 29] ("Intervenors' CD Opp'n") 5-8. Citing the four factors identified as relevant to reopening in Montana v. Clark, 749 F.2d 740, 744 (D.C. Cir. 1984), intervenors appear to argue that to reopen the 1996 rule, FWS was required to hold out that rule (or a part of it) as a proposed regulation, solicit comments on the proposed and existing rules, respond to comments, and publish a final decision explaining its adherence to the existing rule. See id. at 7-8. Because FWS did not do all of these things here, intervenors argue that the 1996 rule was not reopened. AFRC responds that

the 1996 rule was reopened, asserting that under D.C. Circuit precedent, only two factors must be present for reopening, both of which were present here: (1) a formal APA rulemaking and (2) an invitation for broad public comment.  See AFRC CD Reply 15-18 (citing cases).

The Court does not see reopening as something to assess using a simple two- or four-factor test, as the respective sides urge.[14]  In any given case, the "entire context" must be examined to determine whether the agency undertook a "'serious, substantive reconsideration'" of the prior rule.  P & V Enters., 516 F.3d at 1024 (quoting Nat'l Mining Ass'n v. U.S. Dep't of Interior, 70 F.3d 1345, 1352 (D.C. Cir. 2009));  accord Am. Road & Transp. Builders Ass'n v. EPA, 588 F.3d 1109, 1115 (D.C. Cir. 2009).  Viewing the entire context of the 2006-2008 rulemaking process, the Court concludes that FWS indeed undertook a serious, substantive reconsideration of the 1996 rule.

In the 2006 proposed rule (a formal notice of proposed rulemaking), FWS discussed in detail the methodology it had used to identify the areas proposed for critical habitat and at times explained why and how that methodology differed from the one it had used in 1996.  For example, FWS explained that it revised the PCEs for the murrelet to make them more specific based on new information, and that it believed LSRs were appropriate for exclusion under section 4(b)(2) of the ESA based on a change in policy since 1996.  See 71 Fed. Reg. at 53,846-47.  It also explained the "main reasons for the differences" between the proposed and existing critical habitat designations.  Id.  In short, a review of the 2006 proposed rule shows that the

---

[14] FWS's position is that there was in fact a reopening, but it does not offer any reasoned argument supporting that position.  See Defs.' Reply in Supp. of Joint Mot. for Entry of Consent Decree [ECF 31] ("FWS CD Reply") 4 (stating only that "there are sufficient allegations that the Service took another look at issues covered by the 1996 designation through its 2008 and 2011 rulemakings").

agency devoted considerable time and effort to developing the proposed revision and, implicitly in some ways and explicitly in others, "reexamined its former choice."  See Pub. Citizen, 901 F.2d at 151; see also P & V Enters., 516 F.3d at 1024 (noting evident lack of "commitment of agency resources" in finding no reopening); id. at 1025 (stating that advanced notice of proposed rulemaking "did not purport to represent the Corps' considered reevaluation and updated judgment on the substance of the 1986 rule").  In addition, FWS sought broad public comment on the proposed rule, and identified particular areas of interest that went to the heart of the 1996 existing and 2006 proposed rules, such as "whether it is prudent to revise currently designated critical habitat" and "what areas that were occupied at the time of listing that contain the features that are essential for the conservation of the species should be included in our revised designation." 71 Fed. Reg. at 53,838; see also Appalachian Power Co., 251 F.3d at 1033 (relying on fact that EPA apparently reopened comment on the growth factors challenged in court); Edison Elec. Inst. v. EPA, 996 F.2d 326, 332 (D.C. Cir. 1993) (finding reopening where "EPA explicitly invited comments on the precise question for which petitioners now seek review").

Intervenors gloss over the critical analysis contained in the 2006 proposed rule, stating merely that proposed changes to an existing rule do not alone trigger a reopening.  Intervenors' CD Opp'n 6.  But the cases cited by intervenors on this point do not lead to the conclusion that there was no reopening here.  In P & V Enterprises, for example, the agency issued an "advance" notice of proposed rulemaking in which it requested comments to help it assess how to approach a "future proposed rulemaking" but said "nothing on the merits."  516 F.3d at 1024-25 (internal quotation marks omitted) (stating that publishing the advance notice of proposed rulemaking was "comparable" to requesting comment on a petition for commencement of a rulemaking, as the

agency did in National Mining Association, 70 F.3d at 1351).  Here, unlike in P & V Enterprises
or National Mining Association, the agency did not just hold out rulemaking as a "possible next
step"; it issued an actual proposed rulemaking setting forth its considered views "on the merits."
See P & V Enters., 516 F.3d at 1024-25; Nat'l Mining Ass'n, 70 F.3d at 1351.

Intervenors stress FWS's so-called abandonment of the proposed rule in 2008 and the fact
that FWS did not substantively reaffirm the 1996 rule, claiming: "In all the cases where courts
have found reopener, the courts have also found that the agency substantively decided to reaffirm
the old rule."  Intervenors' CD Opp'n 7-8.  Intervenors are incorrect.  What matters for reopening
is whether the agency reconsidered or reexamined its prior rule and then, after doing so, adhered
to the prior rule.  Although an agency's substantive reaffirmance of an existing rule may shed
light on whether the rule was reopened, such reaffirmance is not required for reopening.  In
Appalachian Power Co., for example, the court concluded that an issue had been reopened
through two "Technical Amendments" to an existing rule, even though neither the pre-
amendment call for comments nor the published Technical Amendments specifically mentioned
the issue.  See 251 F.3d at 1031-33; cf. Edison Elec., 996 F.2d at 330-32 (finding reopening
where agency's rationale for not revising regulation was that revision "would result in a rule that
would 'be very difficult to implement and enforce'").  Because reopening may be implicit, see
Pub. Citizen, 901 F.2d at 150, it is not necessary that an agency give explicit reasons for adhering
to its prior approach.

Here, as discussed above, FWS reopened the aspects of the 1996 rule that AFRC is
challenging in this lawsuit.  In 2008, notwithstanding this reopening, FWS left the 1996 rule in
effect.  The agency did not say that it was doing so because the 1996 rule was correct, but merely

cited "uncertainty regarding the effects of current BLM Resource Management Plan revisions."

73 Fed. Reg. at 12,067-68.  Had this decision not to revise the 1996 rule been the only agency

action at issue, there would not have been a reopening.  See P & V Enters., 516 F.3d at 1025-26

(finding press release announcing agency's decision not to issue new rule insufficient to effect

reopening, as press release did not provide new justifications for retaining old rule or any "insight

into whether the [agency] had rethought the policy underlying the 1986 rule").  However, the

absence of a more substantive explanation in FWS's 2008 decision did not undo the reopening

that had already taken place.  That FWS stood by the 1996 critical habitat designation in the face

of its reconsidered judgment that changes were in order actually bolsters, not undermines, the

justification for permitting a renewed opportunity for judicial review in this case.  Accordingly,

the Court concludes that FWS reopened the 1996 critical habitat designation in 2006-2008 and

that AFRC's Fourth and Sixth Claims challenging that designation are not untimely.

> **B.     Vacatur Without Notice and Comment**

Intervenors next argue that the Court should reject the proposed consent decree because it

would impermissibly allow the murrelet critical habitat to be vacated without notice and

comment as required by the APA and ESA.  See Intervenors' CD Opp'n 10-11 (citing 5 U.S.C.

§ 553; 16 U.S.C. § 1533(a)(4)-(6)).  Intervenors are correct that ordinarily an agency rule may not

be repealed unless certain procedures, including public notice and comment, are followed, and

that this is true even where the rule at issue may be defective.  See 5 U.S.C. § 553; Consumer

Energy Council v. FERC, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982) (rejecting argument that

notice and comment requirements do not apply to "defectively promulgated regulations"); Nat'l

Parks Conservation Ass'n v. Salazar, 660 F. Supp. 2d 3, 5 (D.D.C. 2009).  But notice and

comment is not required in all cases.  It is not required, for example, when a court vacates a rule after finding the rule deficient on the merits.  See, e.g., Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

FWS and AFRC argue that the notice and comment requirements of § 553 similarly do not apply when a court approves a consent decree that vacates a rule.  Two judges in this district have so held.  See Home Builders Ass'ns of N. Cal. v. Norton, 293 F. Supp. 2d 1, 5 (D.D.C. 2002); Nat'l Ass'n of Home Builders v. Evans, No. 00-2799, 2002 WL 1205743, at *3 (D.D.C. Apr. 30, 2002) (collectively, "the Home Builders cases").  Intervenors point to two more recent decisions in this district and submit that these decisions "limit the applicability of the Home Builders cases."  Intervenors' CD Opp'n 13 (citing Carpenters Indus. Council v. Salazar, 734 F. Supp. 2d 126, 135-36 (D.D.C. 2010); Nat'l Parks Conservation Ass'n, 660 F. Supp. 2d at 5).  But these cases involved motions for voluntary remand and vacatur, not motions for entry of a consent decree, and in Carpenters Industrial Council the court even recognized its "authority to vacate a critical habitat designation without a determination of the merits through the entry of a proposed consent decree."  See 734 F. Supp. 2d at 136 n.9 (citing the Home Builders cases).  Intervenors assert that the label attached to the action (consent decree versus voluntary remand) should not matter to the outcome, and that in neither case should FWS and AFRC be permitted to bypass the statutory requirements.  But a consent decree is a "judicial act" that is materially different from a voluntary remand.  See Citizens, 718 F.2d at 1125; see also Nat'l Parks Conservation Ass'n, 660 F. Supp. 2d at 4.  Moreover, the D.C. Circuit recently granted an agency's request to vacate and remand concededly flawed portions of a rule without even mentioning the notice and comment requirements of the APA.  See Sierra Club v. EPA, 705 F.3d

458, 463-66 (D.C. Cir. 2013).  In short, the cases cited by the parties indicate that the Court may

approve the consent decree proposed here, even though it would vacate critical habitat without

formal notice and comment.

      C.     <u>Fairness</u>

      That the Court has the authority to the enter the proposed consent decree does not mean

that it is appropriate to do so, however.  The Court must first determine that the consent decree is

"fair, adequate, reasonable and appropriate under the particular facts" and that it is in the public

interest.  <u>See</u> <u>Citizens</u>, 718 F.2d at 1126.

      As an initial matter, the Court observes that this is not a typical settlement agreement.

The proposed consent decree would, as intervenors stress repeatedly, allow FWS and AFRC to

accomplish something through an act of this Court that they could not do on their own.  No one

disputes that FWS could not unilaterally vacate the 1996 critical habitat designation without

going through the statutorily-prescribed notice and comment process.  Although, for the reasons

just discussed, this fact does not preclude the Court from entering the proposed consent decree, it

gives the Court some pause.  If every lawsuit challenging agency action ended in a consent

decree giving a private interest group plaintiff the relief it was seeking, the procedural safeguards

of the APA would be eviscerated.  The public has an interest in seeing these procedural

safeguards enforced.  Hence, it is the Court's view that the particular remedy proposed here

warrants careful scrutiny.  <u>Compare</u> <u>Wells Fargo</u>, 891 F. Supp. 2d at 143 (finding that consent

decree "easily survive[d] the limited scrutiny appropriate" in that case).  With this in mind, the

Court considers the arguments for and against entry of the consent decree.

      FWS and AFRC assert that the proposed consent decree "embodies a reasonable

compromise by the parties thereto."  Joint Mot. for Approval of Consent Decree and Partial

Dismissal with Prejudice [ECF 25] ("Joint CD Mot.") 7.  They explain that the consent decree

would give AFRC less than all of the relief it seeks (in addition to vacatur and remand, AFRC

has requested declaratory relief).  Id. at 8.  In exchange for this "compromise" on AFRC's part

and in light of FWS's determination that the current critical habitat designation "may be

inconsistent with" the ESA's definition of critical habitat, FWS would reconsider the murrelet

critical habitat designation and issue a revised rule pursuant to a "reasonable schedule."  Id.

     At first glance, this strikes the Court as a pretty good deal for AFRC.  Although AFRC

would not get a ruling from the Court on the merits of its critical habitat claims, it would achieve

the (presumably) primary objective of its lawsuit: vacatur of all critical habitat for the murrelet,

and a remand period of more than five years, likely a much longer duration than AFRC could

have hoped for when it filed suit.

     In approving a typical consent decree, it is not the Court's task to "inquire into the precise

legal rights of the parties [or] reach and resolve the merits of the claims or controversy."  See

Citizens, 718 F.2d at 1126 (internal quotation marks omitted); see also id. at 1125 ("[T]he

long-standing rule is that a district court has power to enter a consent decree without first

determining that a statutory violation has occurred.").  But where, as here, a consent decree

would allow the parties to bypass the notice and comment requirements of the APA and ESA, the

Court concludes that assessing the consent decree's fairness, reasonableness, and consistency

with the public interest requires some consideration of the merits.  Although the parties suggest

to varying degrees that consideration of the merits is inappropriate here, they nevertheless

incorporate aspects of the merits into their arguments.  See, e.g., Pls.' Supp. Mem. in Supp. of

Joint CD Mot. [ECF 26] ("AFRC Supp. CD Mem.") 3 (arguing that AFRC is "virtually certain to prevail" on its Fourth and Sixth Claims); Intervenors' CD Opp'n 19 (noting that FWS and AFRC are not asking Court to rule on merits but then making assertions about importance of occupied and unoccupied habitat); FWS CD Reply 11, 13 n.7 (stating that Court should not delve into merits but then asserting that FWS "designated only occupied critical habitat for the murrelet"); AFRC CD Reply 22-23 (no requirement to reach merits).

The appropriateness of examining the legal basis for vacatur (i.e., the merits) is supported by the two Home Builders cases relied on by FWS and AFRC.  In each of those cases, the agency had entered into a proposed consent decree to vacate critical habitat in light of the Tenth Circuit's decision in New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Service, 248 F.3d 1277 (10th Cir. 2001).  In the first case, National Ass'n of Home Builders v. Evans, the agency had acknowledged that the approach it had taken in analyzing economic impacts under section 4(b)(2) of the ESA was "similar to the approach ruled to be insufficient by the court in New Mexico Cattle Growers."  2002 WL 1205743, at *4.  Before approving the proposed consent decree, the court reviewed the Tenth Circuit's decision, found that it was "well-reasoned and comport[ed] with the express statutory language of Congress," and concluded that, "[c]learly, there is a problem with the current process underlying the critical habitat designation process." Id. at *3.  Relying in part on the "persuasive rationale underlying the Tenth Circuit's opinion," the court concluded that the consent decree was fair, equitable, and in the public interest and that vacating the rule was permissible.  Id.  That certainly seems to be a conclusion resting at least in part on an assessment of the basis for the relief sought.  By the time of the second Home Builders decision, Home Builders Ass'ns of Northern California v. Norton, about six months later, FWS

44

had "decided to adopt the economic impact methodology of <u>New Mexico Cattle Growers</u> and apply it to all critical habitat determinations nationwide." 293 F. Supp. 2d at 3. The court agreed with the decision in the first <u>Home Builders</u> case, determined that the methodology of <u>New Mexico Cattle Growers</u> was consistent with the ESA, and held that "vacating the [critical habitat designation at issue], rather than leaving it in place pending a new rule, is fair and reasonable in light of the Department of Interior's decision to vacate all critical habitat designations in order to conduct new rulemakings consistent with the methodology of <u>New Mexico Cattle Growers</u>." <u>Id.</u> at 4-5 & n.2. Again, some assessment of the strength of plaintiffs' claims (i.e., of the merits) is implicit in that conclusion.

Like the courts in the <u>Home Builders</u> cases, this Court will examine the reasons for vacatur put forth by the proponents here. FWS states that it has determined, as it did in those cases, "that it should reconsider its critical habitat designation for the murrelet in light of case law that has issued since the designation was completed." Joint CD Mot. 14. The joint motion explains that since the 1996 designation, courts have required FWS to "specify with more precision" how designated areas meet the statutory definition of critical habitat. <u>Id.</u> at 8-9 (citing <u>Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.</u>, 616 F.3d 983 (9th Cir. 2010); <u>Ariz. Cattle Growers' Ass'n v. Salazar</u>, 606 F.3d 1160 (9th Cir. 2010); <u>Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior</u>, 344 F. Supp. 2d 108 (D.D.C. 2004)). In light of these decisions, FWS acknowledges that the current critical habitat designation for the murrelet "may be inconsistent with" the ESA's definition of critical habitat. <u>Id.</u> at 8.

The Court has reviewed the cases cited in the joint motion and concludes that the circumstances of this case are different from those in the <u>Home Builders</u> cases. There, the defect

in the existing critical habitat designations was both clear and discrete: the agency's approach to the economic impact analysis required by section 4(b)(2) of the ESA.  See Nat'l Ass'n of Home Builders, 2002 WL 1205743, at *3 (comparing "incremental baseline approach" used by FWS to New Mexico Cattle Growers approach); see also Home Builders Ass'n, 293 F.3d at 4 (same). Here, by contrast, FWS has pointed to no particular aspect of its critical habitat designation that is defective or even questionable.  It has merely cited cases discussing the requirements of 16 U.S.C. § 1532(5) and said, vaguely, that the challenged designation "may" not meet those requirements because the cases require the agency to be more precise in explaining how those requirements are met.  Joint CD Mot. 8-9; see also FWS CD Reply 10 (stating that case law reveals the "potential inconsistency" of current critical habitat designation with statutory definition).  So the Court has little from FWS by which to evaluate the significance of the cases cited in relation to AFRC's claims in this case.  In short, in the Home Builders cases FWS had already decided that the critical habitat designation was defective, while here the proposed remand is to permit that determination to be made by FWS.  See Proposed Consent Decree 2.

Moreover, keeping in mind that AFRC's Fourth and Sixth Claims assert that FWS designated areas that were not "occupied" at the time of listing and did not contain PCEs, it is not obvious that the cases cited compel a victory for AFRC.  For example, in Arizona Cattle, the Ninth Circuit indeed observed that the ESA differentiates between "occupied" and "unoccupied" habitat, see Proposed Consent Decree 1-2,[15] but the court also noted that determining whether an

_____

[15] The proposed consent decree contains a provision that states:

WHEREAS, since Federal Defendants promulgated the 1996 rule designating critical habitat for the murrelet, the U.S. Court of Appeals for the Ninth Circuit has issued decisions in Arizona Cattle Growers[' Ass'n] v. Salazar, 606 F.3d 1160

area is "occupied" is a "highly contextual and fact-dependent inquiry" and that such factual

questions are "within the purview of the agency's unique expertise" and entitled to deference.

See 606 F.3d at 1163-65 (citing Cape Hatteras, 344 F. Supp. 2d at 119-20); see also id. at 1167

("[D]etermining whether an area is occupied or merely will be occupied in the future may be

complicated in the context of migratory or mobile species.").  And Cape Hatteras indeed

addressed the statutory requirement that PCEs be "found" on areas designated as critical habitat,

see Proposed Consent Decree 2, but that requirement was not a new revelation, and PCE findings

are also fact-specific.  See 344 F. Supp. 2d at 122-23; see also Home Builders Ass'n, 616 F.3d at

988-89 (rejecting challenge based on FWS's use of PCEs in designation and stating that

precedent "requires FWS to be more generous in defining area as part of the critical habitat

designation").  Because the subject matter of AFRC's Fourth and Sixth Claims is technical and

fact-specific, even if those claims appeared facially meritorious, the Court would not just accept

AFRC's assertion that it is "virtually certain to prevail" on them without either a full-fledged

determination of the merits or a more meaningful explanation from the agency, neither of which

the Court has now.

      Finally, a brief review of the 1996 critical habitat designation does not convince the Court

---

      (9th Cir. 2010), and Home Builders Ass'n [of N. Cal.] v. [U.S. Fish & Wildlife
      Serv.], 61[6] F.3d 983 (9th Cir. 2010), that address the differences between
      designating areas as occupied versus unoccupied critical habitat, and the U.S.
      District Court for the District of Columbia issued a decision in Cape Hatteras
      Access Preservation Alliance v. U.S. Department of Interior, 344 F. Supp. 2d 108
      (D.D.C. 2004), that addresses the requirement that areas designated as critical
      habitat must contain the physical or biological features essential to the
      conservation of the species.

Proposed Consent Decree 2.

that it should be vacated in its entirety.  In designating critical habitat, FWS apparently did so

with the statutory definition in mind.  For example, the agency explicitly determined PCEs for

the murrelet and used survey information about murrelet "presence/absence and occupancy" to

designate specific areas.  61 Fed. Reg. at 26,264-65.  It responded to a comment contending that

it was designating areas not "occupied" by murrelets at the time of listing and another comment

challenging its methodology for determining "occupied" sites.  Id. at 26,273-74.[16]  And the

agency noted that it did not designate certain lands proposed for designation because it

"determined that they did not contain the primary constituent elements or were not considered

essential to the conservation of the species."  Id. at 26,267.  Despite these indicia that the 1996

critical habitat designation, or substantial parts of it, was based on the statutory definition,

AFRC's primary contention appears to be that FWS designated LSRs as critical habitat without

determining that they (the LSRs) were occupied at the time of listing or contained PCEs.  See

AFRC CD Reply 3; Compl. ¶¶ 49-50, 58-60.  If the Court is not to make a definitive

determination on the merits of this contention (and it will not do so at this time), some statement

from the agency on this issue would have been helpful to evaluating the proposed consent decree.

Compare Nat'l Ass'n of Home Builders, 2002 WL 1205743, at *3 (concluding that proposed

consent decree was fair and equitable resolution of issues raised after finding that specific

methodology identified in consent decree as potentially flawed was in fact flawed).  But FWS has

offered nothing more than its statement that the critical habitat designation "may" be inconsistent

--------

[16] It is unclear to the Court whether there is a difference between occupied areas for
purposes of the statutory definition and "occupied sites" as discussed in the 1996 rule.
Uncertainties such as this weigh in favor of letting the agency speak on the technical aspects of
the rule.

with the definition of critical habitat (in what way or in what relation to AFRC's claims, FWS has not said).

For all of these reasons, it is not clear that vacatur of the 1996 critical habitat designation is a fair and equitable resolution of AFRC's claims and is in the public interest. The Court again stresses the unusual nature of the proposed remedy, and observes that more is required to bypass the procedural requirements of the ESA and APA than has yet been put forth here. If a longstanding critical habitat designation is to be vacated entirely pursuant to an agreement between a private litigant and the government – and over the objection of others – the Court must be reasonably confident that there is a sound legal basis for vacatur. Only then will the public's interest in proper process and in the substantive provisions of the ESA be furthered. Here, AFRC has made a case for vacatur. But missing from the equation is any concession of error by the agency, or even any hint as to how exactly, in FWS's view, the critical habitat designation "may" be deficient. This is in contrast not only to the Home Builders cases, already discussed, but also to other cases in which courts have vacated agency rules pursuant to an agency's request for vacatur. See, e.g., Sierra Club, 705 F.3d at 463, 466 (vacating and remanding provisions of EPA rule based on agency's conceded lack of authority to promulgate those provisions); Bldg. Indus. Legal Def. Found. v. Norton, 231 F. Supp. 2d 100, 103, 108 (D.D.C. 2002) (vacating critical habitat where "[a]ll parties, including the responsible agency, agree[d] that the economic analyses used in designating the critical habitats [were] substantively defective"); cf. Consumer Energy Council, 673 F.2d at 447 n.79 ("The Commission's argument that notice and comment requirements do not apply to 'defectively promulgated regulations' is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the

regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation.").

The Court's decision is guided by the factors set forth in <u>Allied-Signal</u>, 988 F.2d at 150-51.  Although that case did not involve a consent decree, it provides a helpful framework for evaluating the appropriateness of the remedy proposed here.[17]  The court in <u>Allied-Signal</u> stated that the decision whether to vacate a rule depends on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed."  988 F.2d at 150-51 (internal quotation marks omitted).  Here, without delving into the merits, the seriousness of the rule's deficiencies cannot be definitively assessed.  Nevertheless, AFRC's claims are certainly colorable, and the agency has stated its belief that the 1996 critical habitat designation should be reconsidered, both of which lead the Court to believe that the rule may very well be deficient.

As discussed, however, the present showing on the rule's defects is inconclusive, and this, taken in conjunction with the second <u>Allied-Signal</u> factor, does not support vacatur as proposed by the parties.  Regarding the "disruptive consequences" factor, FWS has determined that vacatur of the critical habitat designation until a revised designation is issued (by not later than 2018 – more than six years after the consent decree was proposed) "will not result in significant harm to the murrelet."  Joint CD Mot. 9; <u>see also</u> <u>id.</u>, Attach. 1, Decl. of Gary Frazer ("Frazer Decl.").

---

[17] This case does not involve the situation, which has received attention in the D.C. Circuit, where a court has found agency action unlawful and is considering remand without vacatur.  <u>See, e.g.</u>, <u>Natural Res. Def. Council v. EPA</u>, 489 F.3d 1250, 1261-62 (D.C. Cir. 2007); <u>id.</u> at 1262-63 (Randolph, J., concurring); <u>id.</u> at 1264-66 (Rogers, J., concurring in part and dissenting in part).  Remand without vacatur has not been proposed here, and the Court uses the <u>Allied-Signal</u> factors only as an aid in evaluating the fairness of the proposed consent decree.

FWS explains that if critical habitat were vacated, the murrelet and its habitat would continue to receive significant protections under provisions of the Northwest Forest Plan governing LSRs (87% of currently designated murrelet habitat is in LSRs) and under other provisions of the ESA, namely the "no jeopardy" provision in section 7(a)(2) and the "take" provision in section 9.  See Frazer Decl. ¶¶ 7-14; see also 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."); id. § 1538(a)(1)(B) (prohibiting "take"); 50 C.F.R. § 17.31(a).  Intervenors dispute this assessment, arguing that critical habitat provides greater protection for a species than listing alone and that the Northwest Forest Plan is not a substitute for critical habitat.  See Intervenors' CD Opp'n 21-23 (citing, inter alia, Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1070 (9th Cir. 2004)).  Intervenors may be correct about these matters as abstract propositions, but the determination by FWS – the expert agency – that the murrelet would not suffer significant harm during the proposed remand period is entitled to some measure of deference.

Yet even accepting the agency's determination that the murrelet would not likely suffer "significant" harm as a result of vacatur, the length of the remand period exacerbates the uncertainties inherent in any predictive determination.  As intervenors point out, the Northwest Forest Plan may change in the coming years, as FWS admits, and such change may be to the murrelet's detriment.  See Intervenors' CD Opp'n 26; FWS CD Reply 14-15.  The magnitude of the change being proposed is by its nature likely to be disruptive.  The current critical habitat designation has been in effect for nearly 17 years, and FWS says that it cannot begin to act on a

new designation until 2017.  See Frazer Decl. ¶ 25.  By that time, murrelet nesting habitat in the

current designation – all or part of which may be legally justified – might be lost irretrievably, or

at least for a very long time.  Forested stands containing 33-foot-high trees do not grow

overnight.  See 71 Fed. Reg. at 53,843.  The length of the remand period is problematic from a

procedural standpoint as well.  By 2017-2018, much of the scientific and other information

compiled during the recent revision processes will likely be outdated.  Were FWS to act sooner,

it might be able to build off of the 2006 proposed rule (into which the agency clearly put

considerable time and resources) and the 2008 updated economic analysis, rather than have to

start completely anew.  In short, the Court views the five- to six-year remand period proposed as

simply too long.  See, e.g., Bldg. Indus., 231 F. Supp. 2d at 107-08 (finding 31-month proposed

time frame "too long" and requiring FWS to promulgate new critical habitat designations within

21 months despite agency's "resource allocation issues").  At least it has not been adequately

justified by FWS (and AFRC).  The Court understands that it may be difficult for FWS to

commit to a shorter remand period in light of the commitments made in MDL agreements.  But

considering that the Court would be vacating a longstanding critical habitat designation, without

public notice and comment and without a determination on the merits, the Court is unwilling on

this record to approve the lengthy and potentially disruptive remand period proposed.

All this is not to say that some modification to the proposed consent decree might not

make it more acceptable to the Court.  As this circuit has recognized, "voluntary settlement of

civil controversies is in high judicial favor."  Citizens, 718 F.2d at 1126 (internal quotation marks

and alteration omitted).  If AFRC is correct that the 1996 critical habitat designation is defective,

then the parties, the Court, and the public would benefit from the resolution of this case by

consent decree rather than by protracted litigation.  Given a fuller explanation from the agency on

the basis for vacatur (which may stop short of an outright admission that the law was violated)

and a more reasonable remand period,[18] the Court might conclude that a consent decree modeled

on the one proposed is fair, reasonable, and in the public interest.  But the Court is unable to

conclude that the consent decree as proposed meets that standard, and the proponents of the

consent decree oppose any unilateral modification of its terms by the Court.  See FWS CD Reply

16-17.  Hence, the Court will deny the joint motion of FWS and AFRC for entry of a consent

decree at this time.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the parties' cross-

motions for summary judgment and will deny the joint motion for entry of a consent decree.  A

separate order accompanies this memorandum opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: March 30, 2013

---

[18] FWS has cited its finite budget in saying that it is unable to commit to a shorter remand
period.  The Court is not unsympathetic to such concerns.  By agreeing to a shorter remand
period, however, the agency might be able to save resources through both the avoidance of
litigation and a more expedited determination process.