| | |
|---|---|
| **AMERICAN FOREST RESOURCE COUNCIL, CARPENTERS INDUSTRIAL COUNCIL, and DOUGLAS COUNTY, OREGON,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DANIEL M. ASHE, Director, U.S. Fish and Wildlife Service, and SALLY JEWELL, Secretary of the Interior,**<br><br>**Defendants,**<br><br>**and**<br><br>**AUDUBON SOCIETY OF PORTLAND, SEATTLE AUDUBON SOCIETY, CENTER FOR BIOLOGICAL DIVERSITY, OREGON WILD, CONSERVATION NORTHWEST, ENVIRONMENTAL PROTECTION INFORMATION CENTER, and SIERRA CLUB,**<br><br>**Defendant-Intervenors.** | Civil Action No.  12-111 (JDB) |

## MEMORANDUM OPINION

Plaintiffs American Forest Resource Council, Carpenters Industrial Council, and Douglas County, Oregon (collectively, "AFRC") brought this action against defendants Daniel M. Ashe, Director of the U.S. Fish and Wildlife Service, and Sally Jewell, Secretary of the Interior

(collectively, "FWS").[1]  Currently before the Court are the parties' cross-motions for summary judgment on AFRC's Third Claim for relief and FWS's motion for voluntary remand without vacatur of its critical habitat designation for the marbled murrelet.  For the reasons stated below, the Court will grant summary judgment in favor of FWS and intervenors on AFRC's Third Claim and grant FWS's motion for voluntary remand.

## BACKGROUND

The background of this case is fully set forth in the Court's March 30, 2013 memorandum opinion.  See Am. Forest Res. Council v. Ashe, No. 12-111, 2013 WL 1289724 (D.D.C. Mar. 30, 2013).  In that decision, the Court granted summary judgment in favor of FWS and intervenors on two of AFRC's three claims regarding FWS's decision not to delist the Washington, Oregon, and California ("tri-state") population of the marbled murrelet.  On the third of these claims, which challenges FWS's determination that the tri-state population was "significant," the Court deferred its decision on summary judgment and remanded to FWS the question whether central California marbled murrelets "interbreed when mature" with other marbled murrelets in the tri-state population.  Id. at *11.

FWS had determined in January 2010 that delisting the murrelet was "not warranted" because the tri-state population was a "distinct population segment" or "DPS" under the Endangered Species Act ("ESA").  See 75 Fed. Reg. 3424 (Jan. 21, 2010).  The ESA defines the term "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  The term "distinct population

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sally Jewell, as successor to former Secretary of the Interior Ken Salazar, is automatically substituted as a defendant.

segment" is not defined by statute, but has been interpreted in a 1996 joint policy issued by FWS and the National Marine Fisheries Service. See 61 Fed. Reg. 4722 (Feb. 7, 1996). The policy identifies three elements to be considered in deciding whether a DPS exists: (1) the discreteness of the population segment in relation to the remainder of its species; (2) the significance of the population segment to its species; and (3) the population segment's conservation status in relation to the ESA's listing standards. See id. at 4725. In finding the tri-state DPS significant, FWS had recognized and relied on the genetic distinctiveness of central California murrelets, but it had not stated explicitly that those murrelets can or do interbreed with other murrelets in the DPS. See 75 Fed. Reg. at 3430. AFRC then asserted in this litigation that two populations of a species cannot be genetically distinct yet interbreed when mature. See Am. Forest Res. Council, 2013 WL 1289724, at *11. Concerned that, if AFRC were correct, FWS's significance determination was based on an overly inclusive DPS, and having no basis in the record to confirm or reject AFRC's assertion, the Court remanded the significance determination to FWS to gain the agency's view on the "interbreeds when mature" question. See id.

FWS has now completed the remand, and has determined that central California murrelets not only are capable of interbreeding with, but actually interbreed with, other murrelets in the tri-state DPS. See Defs.' Notice of Completion of Remand [ECF 58], Ex. 1 ("Remand Mem.") 2-3. The parties have each submitted responses to FWS's determination on remand. AFRC contends that the remand memorandum "is unlawful and should be set aside," and consequently that its motion for summary judgment on its Third Claim (regarding FWS's significance determination) should be granted. See Pls.' Post-Remand Br. in Supp. of MSJ [ECF 61] ("AFRC Post-Remand Resp.") 2, 20. FWS and intervenors maintain that FWS's significance

3

determination was rational and supported by the record and assert that FWS's determination on the "interbreeds when mature" issue simply confirms this conclusion.  See Intervenors' Resp. to Remand Mem. [ECF 60] ("Intervenors' Post-Remand Resp.") 3; Defs.' Reply in Supp. of Remand Mem. [ECF 62] ("FWS Post-Remand Reply") 1-2.

In its March 30, 2013 decision, the Court also denied the joint motion of AFRC and FWS for entry of a proposed consent decree, under which the critical habitat designation for the murrelet would have been vacated and remanded to FWS for a new rulemaking.  Am. Forest Res. Council, 2013 WL 1289724, at *27.  The joint motion was opposed by intervenors, who argued (1) that the Court did not have jurisdiction to enter the proposed consent decree because AFRC's critical habitat challenges were time-barred, (2) that the Court did not have authority to enter the proposed consent decree because it would have vacated a rule without notice and comment, and (3) that the proposed consent decree did not meet the standard of being fair, adequate, reasonable, and appropriate under the particular facts, as well as in the public interest.  Id. at *16; see also id. at *6 (discussing standard set forth in Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983)).  The Court rejected intervenors' first two arguments, concluding that it had both jurisdiction and the authority to enter the proposed consent decree, but was unable to conclude that the proposed consent decree met the applicable standard.  Id. at *21-22, *26.  The Court found it particularly problematic that FWS had not confessed error or explained how the critical habitat designation might be deficient and that the proposed remand period was to last until September 2018.  Id. at *25-26.  It left open the possibility, however, that it might accept a modified proposed consent decree that included a more robust explanation from FWS on the rule's deficiencies and contemplated a shorter remand period.  Id. at *27.

FWS now explains that it "can no longer defend its 1996 designation of critical habitat for the murrelet," because in making the designation it did not "provide a detailed explanation of how the areas designated meet the statutory definition of 'critical habitat,'" as required by cases decided since the 1996 designation. See Defs.' Mot. for Voluntary Remand Without Vacatur [ECF 54] ("FWS VR Mot.") 8, 10-11. Accordingly, FWS asks that the critical habitat designation be remanded, and it seeks a remand period two years shorter than that in the proposed consent decree. The agency represents that it can commit to issuing a proposed revised designation by September 30, 2015, and a final revised designation by September 30, 2016. See id. at 15-16. But rather than seek remand and vacatur jointly with AFRC in a motion for entry of a modified proposed consent decree, FWS has filed a motion for voluntary remand without vacatur. AFRC, which seeks vacatur of the murrelet critical habitat designation in this action, opposes FWS's motion. See Pls.' Opp'n to FWS VR Mot. [ECF 56] ("AFRC VR Opp'n") 1-2. Intervenors do not oppose remand without vacatur. See Intervenors' Resp. to FWS VR Mot. [ECF 55] ("Intervenors' VR Resp.") 1.

**DISCUSSION**

**I.    The Parties' Cross-Motions for Summary Judgment on AFRC's Third Claim**

Now that FWS has completed the remand, AFRC contends that it is entitled to summary judgment on its claim that FWS's significance determination was arbitrary and capricious under the Administrative Procedure Act. See 5 U.S.C. § 706(2).

    A.    FWS's Determination on Remand

On remand, FWS evaluated whether there is evidence of interbreeding between murrelets in central California and murrelets in northern California. Remand Mem. 1. Examining the

birds' long-distance movements, it found that "murrelets anywhere within the DPS are capable of intermingling and interbreeding with murrelets in other parts of the DPS, specifically between central California and northern California." Id. at 2 (citing evidence of murrelet movements of several hundred kilometers). FWS also found "evidence of actual interbreeding." Id. It explained that, although central California murrelets diverged genetically from northern populations during the twentieth century, "they are not completely isolated genetically because very low gene flow continues to occur among murrelets across the range, and specifically between northern and central California." Id. at 3 (citation omitted). This gene flow, along with evidence of northern California murrelets "immigrating" into central California, led FWS to conclude that "the murrelets in central California are interbreeding, albeit at low levels, with murrelets from elsewhere within the DPS." Id.

In light of this conclusion, FWS reaffirmed its determination that the tri-state population of the murrelet is sufficiently significant to warrant listing as a DPS. See id. at 3-4. The agency again stated, as it had in its January 2010 "not warranted" decision, that loss of the tri-state DPS would result in a significant gap in the range of the murrelet. See id.; accord 75 Fed. Reg. at 3430. According to FWS, such a gap would be significant because the tri-state area accounts for about 18 percent of the murrelet's coastal distribution, spans 17 degrees of latitude, is located at the southern periphery of the murrelet's range, and contains an ecologically distinct forest system, the coastal redwoods. See 75 Fed. Reg. at 3430. FWS also found the tri-state DPS significant because its loss would result in the loss of "unique genetic characteristics that are significant to the taxon." See id. The "unique genetic characteristics" referred to are those of central California murrelets, which, as FWS explained on remand, are "moderately [genetically]

differentiated," but not "completely isolated."  See id.; Remand Mem. 3.

In a footnote in its determination on remand, FWS also said the following:

> While the Service is performing this analysis in accordance with the Court's remand order, the Service believes that it is not necessary to make an explicit finding of interbreeding among various groups of organisms that comprise a DPS, but rather relies on the "biological species" concept employed during taxonomic identification of species and subspecies.

> The ESA defines "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  The Service interprets the phrase "interbreeds when mature" to mean that a DPS must consist of members of the same species or subspecies.  The "biological species" concept, which defines species according to a group of organisms' actual or potential ability to interbreed, and their relative reproductive isolation from other organisms, is perhaps the most widely accepted approach to defining species.  Individuals of a species or subspecies are biologically capable of interbreeding if given the opportunity, but all members need not actually interbreed with each other to represent members of the same species or subspecies.  As an example, bald eagles (Haliaeetus leucocephalus) in the State of Alaska are unlikely to interbreed with bald eagles in the State of Florida, due to geographic distance; however, these individuals would be biologically capable of interbreeding if given the opportunity, and are considered to be members of the same species.  The Act's use of the phrase "interbreeds when mature" requires only that one or more groups of individuals that comprise a DPS are members of the same species or subspecies, as defined by the biological species concept.

Remand Mem. 1 n.1.

B.      "Interbreeds When Mature"

The parties make much of FWS's footnote interpreting the phrase "interbreeds when mature" in the ESA's definition of "species."  In the footnote, FWS takes the position that the phrase means that "a DPS must consist of members of the same species or subspecies," as defined by the "biological species" concept.  See Remand Mem. 1 n.1.  Intervenors assert that the phrase means that members of a DPS must be "capable of interbreeding."  See Intervenors' Post-

Remand Resp. 3. And AFRC asserts that the phrase means that members of a DPS must actually interbreed. <u>See</u> AFRC Post-Remand Resp. 6. The Court need not now decide which (if any) of these interpretations is correct, however, because under any interpretation of the phrase "interbreeds when mature," FWS has rationally concluded that central California murrelets actually interbreed when mature with other murrelets in the tri-state DPS, albeit at low levels. <u>See</u> Remand Mem. 3.

Before addressing AFRC's arguments concerning FWS's determination on remand, the Court finds it necessary to clarify the following statement in its March 30, 2013 memorandum opinion: "If the genetic distinctiveness of the two populations comprising the tri-state DPS means that they do not interbreed when mature, then FWS's significance determination cannot be upheld." <u>See</u> <u>Am. Forest Res. Council</u>, 2013 WL 1289724, at *11. In support of this statement, the Court cited both the statutory definition of "species," which uses the phrase "interbreeds when mature," as well as the Ninth Circuit's decision in <u>Modesto Irrigation District v. Gutierrez</u>, 619 F.3d 1024 (9th Cir. 2010), in which the court concluded that "the statutory definition of a species as a DPS which interbreeds when mature is grammatically ambiguous" and that the position taken by the National Marine Fisheries Service was supported by the statutory language, <u>id.</u> at 1032 (alterations and internal quotation marks omitted). The agency had explained its position as follows:

> The ESA requirement that a group of organisms must interbreed when mature to qualify as a DPS is a necessary but not exclusive condition. Under the definition, although all organisms that belong to a DPS must interbreed when mature (at least on some time scale), not all organisms that share some reproductive exchange with members of the DPS must be included in the DPS.

<u>Id.</u>

In remanding FWS's significance determination here, the Court's intent was not to define once and for all the meaning of the arguably "ambiguous" phrase "interbreeds when mature." Because the phrase appears in the ESA's text, the Court concluded that interbreeding when mature, however defined, is a statutory condition for classification as a DPS. The Court did not hold that FWS must make an explicit finding that members of a DPS interbreed when mature in every case. But because in this case AFRC had asserted that two genetically distinct populations cannot interbreed when mature, and because FWS had not spoken on this disputed issue of biology, the Court remanded the significance determination to obtain the agency's considered view. See Am. Forest Res. Council, 2013 WL 1289724, at *11. The Court intended only to have FWS determine whether central California murrelets and other murrelets in the DPS "interbreed when mature," not to define the meaning of that phrase for the agency. Accordingly, a perhaps better formulation of the Court's prior statement is that FWS's significance determination would be called into question if the genetic distinctiveness of the two murrelet populations in the tri-state DPS means that they do not, or cannot, "interbreed when mature," however that phrase is defined.

AFRC does not seriously contest FWS's conclusion on remand that central California murrelets actually interbreed with their northern counterparts. In fact, AFRC now states that FWS's finding of interbreeding at low levels "reflects scientific consensus since at least 2007," and argues that FWS's recognition of this scientific consensus "does not answer any relevant question." See Pls.' Supp'l Post-Remand Br. [ECF 65-1] 15-16.[2]

---

[2] AFRC has filed a motion to amend the scheduling order, or, in the alternative, for leave to file a supplemental brief, or, in the alternative, to strike FWS's reply and notice of supplemental authority. See Pls.' Mot. [ECF 65]. The Court will allow the supplemental brief to

Yet during the first round of summary judgment briefing in this case, AFRC argued that "FWS could not lawfully find that central California murrelets 'interbreed[] when mature' with other birds in the Tri-state DPS." See AFRC MSJ [ECF 33] 15-16. AFRC did not qualify this statement by saying that, of course, FWS could lawfully find that murrelets in the DPS interbreed at low levels. In addition, AFRC contended that FWS had acted arbitrarily and capriciously not only because a finding of interbreeding when mature would run counter to the evidence before the agency, but also because FWS had "entirely failed to consider" the issue. See id. at 14-15 (internal quotation marks omitted). Indeed, the record did not reflect FWS's direct consideration of the "interbreeds when mature" issue, and this was a reason why the Court could not just accept the arguments of FWS and intervenors that the record supported a finding that central California murrelets interbreed with murrelets elsewhere in the tri-state DPS. See, e.g., FWS MSJ Reply [ECF 43] 19-20; Intervenors' MSJ Reply [ECF 44] 7-9; see also Manin v. Nat'l Transp. Safety Bd., 627 F.3d 1239, 1242-43 (D.C. Cir. 2011) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)). As it turns out, the record did support such a finding, for the reasons stated in FWS's determination on remand. But FWS might also have reached a different conclusion, and at the time of the Court's prior decision, the agency (as opposed to its lawyers) had not yet spoken. At the very least, then, FWS's determination on remand assures the Court that the agency considered the issue; moreover, it provides a rational explanation for the agency's determination that central California murrelets and other tri-state murrelets do in fact interbreed when mature. Hence,

_____

be filed. Most of it relates to the footnote in FWS's remand memorandum, on which the Court does not rely. The remainder includes AFRC's response to FWS's notice of supplemental authority, which AFRC was entitled to file, and arguments for vacatur of the remand memorandum that the Court rejects. Hence, FWS and intervenors are not prejudiced by the filing of AFRC's supplemental brief.

AFRC's suggestion that the remand memorandum accomplished nothing relevant is without merit.

AFRC additionally argues that the remand memorandum should be set aside because it fails to address three factors that, in AFRC's view, the Court "specifically identified" in its opinion: (1) the reasonableness of including in the DPS a population of murrelets that is genetically distinct from other murrelets in the DPS; (2) the reasonableness of relying on those murrelets' genetic distinctiveness in finding the DPS significant; and (3) whether central California murrelets should be designated as a separate DPS. See AFRC Post-Remand Resp. 2-3, 11-12. With respect to the first two of these factors, the Court's concern about central California murrelets' genetic distinctiveness was that their distinctiveness might preclude them from interbreeding with, or being capable of interbreeding with, other murrelets in the DPS. The remand memorandum satisfies this concern, by explaining that central California murrelets "are not completely isolated genetically" and that as a result low levels of interbreeding can and do occur. See Remand Mem. 3. The Court concludes that the ESA's interbreeding requirement is met by low levels of actual interbreeding. See Modesto Irrigation Dist., 619 F.3d at 1032 (accepting position of agency that "'all organisms that belong to a DPS must interbreed when mature (at least on some time scale)'"); Alsea Valley Alliance v. Lautenbacher, No. 06-6093, 2007 WL 2344927, at *6-7 (D. Or. Aug. 14, 2007) (accepting agency interpretation of ESA to require that "members of the same species, subspecies or distinct population segment be capable of interbreeding when mature"), aff'd, 319 F. App'x 588 (9th Cir. 2009). Hence, there is no need to resolve the parties' dispute about the precise contours of that requirement here.

With respect to the possibility of designating a separate DPS, although the Court's

opinion noted AFRC's prior suggestions that central California murrelets should be recognized as a separate DPS, it did so in the context of analyzing whether to reach the "interbreeds when mature" issue at all.  See Am. Forest Res. Council, 2013 WL 1289724, at *11.  The Court did not hold that FWS had to address, specifically and on the record, whether central California murrelets should be designated as a separate DPS, and it will not impose such a requirement now.  See Safari Club Int'l v. Jewell, Nos. 11-1564, 12-340, 2013 WL 4041541, at *37-38 (D.D.C. Aug. 9, 2013) (concluding that, where FWS is not petitioned to designate a population as a separate and distinct DPS, decision whether to do so is discretionary and not subject to review).[3]  Accordingly, the Court finds no arbitrary and capricious failure on FWS's part to consider relevant factors.

C.      FWS's Significance Determination

AFRC finally argues that FWS failed to find a rational connection between the fact it found – that low levels of interbreeding occur – and its conclusion that the tri-state DPS, inclusive of central California murrelets, is significant.  An agency is required to articulate a satisfactory explanation for its actions, including "a rational connection between the facts found and the choice made."  See Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (internal

---

[3] The Court also rejects AFRC's argument, raised for the first time in its post-remand briefing, that FWS was required to address "allopatric speciation," or "[s]peciation by geographic isolation."  See AFRC Post-Remand Resp. 13.  Because, as discussed, FWS adequately supported its determination that murrelets in the tri-state DPS interbred when mature, the agency satisfied the Court's concerns in remanding the significance determination.  FWS was not required to provide additional justifications for including central California murrelets in the DPS in anticipation of arguments that might later be raised by AFRC.  In any case, AFRC points to no evidence that was before the agency indicating that the two populations of murrelets were different species, rather than genetically distinct populations of the same species.  See AFRC Post-Remand Resp. 13-16.

quotation marks omitted). As AFRC acknowledges, however, a reviewing court may "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" <u>See</u> AFRC Post-Remand Resp. 13 (quoting <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)). AFRC asserts that no reasonably discernible path is to be found in FWS's remand memorandum, but the Court disagrees.

In light of its determination that central California murrelets interbreed when mature with other murrelets in the DPS, FWS reaffirmed its January 2010 significance determination. Its reasoning is not difficult to discern. Factors that may bear on a DPS's biological and ecological significance include: "[p]ersistence of the discrete population segment in an ecological setting unusual or unique for the taxon," "[e]vidence that loss of the discrete population segment would result in a significant gap in the range of a taxon," and "[e]vidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics." 61 Fed. Reg. at 4725. FWS initially found that loss of the tri-state DPS would result in a significant gap in the murrelet's range because the tri-state area accounts for about 18 percent of the murrelet's coastal distribution, spans 17 degrees of latitude, is located at the southern periphery of the murrelet's range, and contains an ecologically distinct forest system, the coastal redwoods. <u>See</u> 75 Fed. Reg. at 3430. The agency also found that loss of the DPS would result in the loss of "unique genetic characteristics" that are significant to the taxon. <u>Id.</u> Had FWS found that central California murrelets should not have been included in the DPS, then the tri-state area would account for only about 10 percent of the murrelet's coastal distribution and span only 9 degrees of latitude, which might not qualify as a "significant" portion of the murrelet's range. And without central California murrelets, the DPS would not be at the periphery, nor would it contain the

"unique genetic characteristics" of central California murrelets.

But because FWS has concluded that central California murrelets are properly included in the DPS, its previously stated rationales remain valid and, in the Court's view, are adequate to withstand arbitrary and capricious review. The Court will not second guess FWS's determination that a hypothetical loss of 18 percent of the murrelet's coastal distribution and 17 degrees of latitude would be significant, as that is the kind of judgment that is best left to agency expertise. And FWS explained the significance of "peripheral and disjunct populations," which "may play an important role in maintaining opportunities for speciation and future biodiversity." See 75 Fed. Reg. at 3430. As pertinent here, the tri-state DPS is located at the southernmost extent of the murrelet's range, i.e., is a peripheral population, and contains both an ecologically distinct forest system, the coastal redwoods, and a genetically distinct group of murrelets, the central California murrelets. See id. In FWS's view, the genetic characteristics of the central California murrelets add to the significance of the tri-state DPS because the loss of these murrelets would mean a loss of "a portion of the species' genetic resources and/or local adaptations" and might "compromise its long-term viability." See id.[4] FWS's reasoning, then, was that the ecological and biological diversity of the tri-state DPS enhance the murrelet's prospects for recovery and thus make it significant to the species as a whole.

In sum, the Court concludes that FWS has provided a rational explanation for its significance determination. AFRC's motion for summary judgment on its Third Claim will be

---

[4] AFRC's suggestion that FWS has not provided a rational basis for including the genetically distinct central California murrelets in the DPS is thus without merit. See AFRC Post-Remand Resp. 19. AFRC offers absolutely no support for its assertion that the inclusion of central California murrelets in the tri-state DPS will somehow eliminate their genetic distinctiveness. See id. at 18-19.

denied, and FWS's and intervenors' cross-motions will be granted.

## II.    FWS's Motion for Voluntary Remand Without Vacatur

Courts in this circuit commonly grant motions for voluntary remand, "preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." See Ethyl Corp. v. Browner, 989 F.2d 522, 524 & n.3 (D.C. Cir. 1993) (citing cases); Carpenters Indus. Council v. Salazar, 734 F. Supp. 2d 126, 132 (D.D.C. 2010); Sierra Club v. Van Antwerp, 560 F. Supp. 2d 21, 23 (D.D.C. 2008). Voluntary remand is generally appropriate "(i) when new evidence becomes available after an agency's original decision was rendered, or (ii) where 'intervening events outside of the agency's control' may affect the validity of an agency's actions." Carpenters Indus. Council, 734 F. Supp. 2d at 132 (citation omitted) (quoting SKF USA, Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001)). Even in the absence of new evidence or intervening events, voluntary remand may be appropriate. For example, an agency might "request a remand (without confessing error) in order to reconsider its previous position," or it might "request a remand because it believes that its original decision is incorrect on the merits and wishes to change the result." See SKF, 254 F.3d at 1029. In such cases, the reviewing court has discretion over whether to remand, as long as the agency's concern is "substantial and legitimate." See id.; Carpenters Indus. Council, 734 F. Supp. 2d at 132; Sierra Club, 560 F. Supp. 2d at 23.

Here, FWS seeks a remand "to reconsider its critical habitat designation for the murrelet" in light of post-1996 case law requiring it to specify how designated areas meet the ESA's definition of "critical habitat." FWS VR Mot. 1. FWS concedes that its explanation for the

15

challenged designation is deficient, and hence it argues that voluntary remand is within the Court's equitable discretion and appropriate in this case. See id. AFRC does not dispute that the Court has discretion to grant voluntary remand in these circumstances, but argues that the equities do not support that result. See AFRC VR Opp'n 1, 8.

      A.      <u>FWS's Designation of Critical Habitat for the Marbled Murrelet</u>

The ESA provides for the designation of geographical areas as "critical habitat" for endangered and threatened species. See 16 U.S.C. § 1533(a)(3)(A). Critical habitat is defined as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

Id. § 1532(5)(A). Physical and biological features that are essential to the conservation of a species and that may require special management considerations or protection are known as "primary constituent elements" or "PCEs." See 50 C.F.R. § 424.12(b). Thus, under the ESA, occupied or unoccupied areas may be designated as critical habitat, but the criteria for designating occupied areas – that the areas contain PCEs – differ from the criteria for designating unoccupied areas – that the areas be essential for the conservation of the species. See 16 U.S.C. § 1532(5)(A)(i)-(ii).

The current critical habitat designation for the marbled murrelet is the product of FWS's

initial designation in 1996, its 2008 decision not to adopt revisions proposed in 2006, and its

minor revision to the designation in 2011. See Am. Forest Res. Council, 2013 WL 1289724, at

*3-4. In designating critical habitat in 1996, FWS concededly did not "identify which designated

areas were occupied at the time of listing" or "make an explicit determination that unoccupied

areas were essential to conservation of the species." See FWS VR Mot., Attach. 1, Decl. of Gary

Frazer (May 16, 2013) ("Frazer Decl.") ¶ 3. FWS asserts that despite these omissions, its

explanation in the preamble to the 1996 rule was consistent with existing case law, although

courts have since imposed a "higher burden" on the agency to provide a more detailed

explanation of how designated areas meet the statutory definition of critical habitat. Id. ¶¶ 3-4;

FWS VR Mot. 10-11 (citing Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior, 646 F.3d 914

(D.C. Cir. 2011); Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv., 616 F.3d 983

(9th Cir. 2010); Ariz. Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160 (9th Cir. 2010)). FWS

admits it did not meet this higher burden in 1996 and hence asks for an opportunity to do so now,

asserting that it "has no reason to believe the areas currently designated do not meet the

definition of 'critical habitat.'" See FWS VR Mot. 11 (citing Frazer Decl. ¶ 5).

      B.     Voluntary Remand Without Vacatur

      Because FWS seeks remand based on its belief that it can no longer defend the murrelet

critical habitat designation, the Court has discretion over whether to remand.[5] See SKF, 254 F.3d

---

     [5] Although FWS couches its remand request as one based on "an intervening change in
the case law," which may constitute an intervening event that "generally require[s]" a remand, the
Court concludes that the so-called "change" in the law identified by FWS is not one that
automatically requires remand. See SKF, 254 F.3d at 1028; FWS VR Mot. 8. The ESA's
definition of critical habitat distinguished between occupied and unoccupied areas before the
cases cited by FWS were decided; hence, the cases' gloss on that distinction and FWS's
obligation to explain how designated areas meet the statutory definition was not novel. Because

at 1029; Carpenters Indus. Council, 734 F. Supp. 2d at 133. FWS stresses that granting a remand

will conserve the Court's and the parties' resources, particularly here, where "'both sides

acknowledge [the record] to be incorrect or incomplete.'" See FWS VR Mot. 11 (quoting Ethyl

Corp., 989 F.2d at 524).[6] AFRC responds that the Court "must consider the equities," and

essentially argues that any benefits of remanding without vacatur will be outweighed by the

harms. See AFRC VR Opp'n 6. AFRC asserts that if FWS's motion is granted, AFRC will be

"irreparably prejudice[d]" because it will be subject to an "unlawful" rule, and without recourse

to challenge it, for at least three more years. See id. at 6, 8. AFRC describes the murrelet critical

habitat designation as a "barrier" to the timber management objectives of the Northwest Forest

Plan and a contributing factor to the decline in federal timber sales in the Pacific Northwest, and

it asserts that proceeding to the merits of this dispute would give it an opportunity "to make a

positive step toward restoring the federal timber supply." See id. at 10-11, 13. AFRC urges that

it should not be denied its day in court and that adjudicating the merits would not waste any

resources because only then can the Court grant AFRC the relief it seeks – vacatur of the

challenged critical habitat designation. See id. at 2, 13.

 As an initial matter, the Court notes it has only two options at this time: either to grant

FWS's motion for voluntary remand without vacatur or to deny FWS's motion and proceed to the

_____

FWS could have taken the position it now takes before the so-called change in the law, the Court
treats the remand request as one based on the agency's recognition of its own error, influenced as
it were by several judicial decisions. Accordingly, remand is discretionary rather than mandatory
in this case. See SKF, 254 F.3d at 1028-29; see also AFRC VR Opp'n 6-8 (asserting that
granting voluntary remand is "far from automatic" and citing cases denying voluntary remand).

 [6] Unlike FWS, however, intervenors apparently do not concede that the critical habitat
rule is deficient. See Intervenors' VR Resp. 5 (stating that "[t]he possibility of upholding the
critical habitat rule against AFRC's claims four and six cannot be ruled out").

merits. AFRC's critical habitat claims have not been fully briefed, and the administrative record as to those claims has not been filed. Hence, it would be premature to decide the merits now and the Court will not do so. In addition, FWS has not asked for vacatur, and neither AFRC nor intervenors argue that any remand should be with vacatur, so the Court does not consider vacatur an option at this time. The Court therefore weighs the equities of remanding without vacatur against those of deciding the merits and possibly vacating the challenged rule.

      1.      Granting FWS's motion will give the agency an opportunity to cure its own mistakes and will conserve the Court's and the parties' resources.

A review of the record persuades the Court that FWS's concerns about the murrelet critical habitat designation are "substantial and legitimate." See Sierra Club, 560 F. Supp. 2d at 23. It appears that the agency should have done a better job of explaining how the areas it designated met the statutory definition of critical habitat. Among other things, FWS did not set a standard for determining "occupied" areas, did not clearly identify which designated areas were occupied at the time of listing, and did not make any findings about unoccupied areas.

FWS now seeks an opportunity to "cure [its] own mistakes." See Ethyl Corp., 989 F.2d at 524. Such requests are commonly granted, and are desirable even where they are driven by the litigation in which they are made. See id.; Lamprecht v. FCC, 958 F.2d 382, 385 (D.C. Cir. 1992) (grant of agency's motion to remand case for reconsideration after vote to rehear case en banc, where agency admitted that decision was erroneous and contrary to law); see also Sierra Club, 560 F. Supp. 2d at 23 ("It is undisputed that administrative agencies have inherent power to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." (internal quotation marks omitted)). And there has been no suggestion that

FWS is acting in bad faith or that its remand request is otherwise improper.  See SKF, 254 F.3d at 1029 ("A remand may be refused if the agency's request is frivolous or in bad faith." (citing Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344, 349 (D.C. Cir. 1998))).

Moreover, a voluntary remand at this time will save the Court's and the parties' resources.  See Ethyl Corp., 989 F.2d at 524.  FWS does not wish to defend the murrelet critical habitat designation, so forcing it to litigate the merits would needlessly waste not only the agency's resources but also time that could instead be spent correcting the rule's deficiencies.  The sooner FWS begins revising the critical habitat designation, the more likely that it can complete the revision by the dates proposed – September 30, 2015 for the proposed rule, and September 30, 2016 for the final rule.

> 2.    AFRC has not shown that it will be unduly prejudiced by remand without vacatur.

On the other hand, remand without vacatur will leave in place a concededly flawed rule for the duration of the remand period.  AFRC argues that the rule's continued enforcement would prejudice its interests in harvesting timber.  It asserts, for example, that because of the 2011 revision to the critical habitat rule, ESA section 7 consultation is now required for certain timber management projects for which consultation "probably" was not required before, and that AFRC's claims in this case are "among the tools that appear to have a likelihood of reversing the federal timber supply curtailment and offering the remaining timber manufacturers the raw material supply they require to remain in business."  See AFRC VR Opp'n 10-11, 13; see also 16 U.S.C. § 1536(a)(2).  The costs of retaining the rule, then, would include the costs of delay pending ESA section 7 consultation and the opportunity costs of foregone timber harvesting that

could take place if the rule were vacated.  But AFRC has not attempted to quantify these costs, nor has it provided any concrete examples of projects impacted by the consultation requirement or additional timber that could be harvested in the next three years if the rule were vacated.  See Natural Res. Def. Council v. U.S. Dep't of the Interior, 275 F. Supp. 2d 1136, 1147 & nn.23-24 (C.D. Cal. 2002) (noting lack of cost estimates and stating that "[a]t worst, if the [critical habitat] rules are ultimately withdrawn then the cost of retaining them during remand is delayed growth").  As AFRC acknowledges, even if the critical habitat designation were vacated, the federal lands designated would remain subject to "significant protections" under the Northwest Forest Plan.  See AFRC VR Opp'n 11 (internal quotation marks omitted).  For these reasons, the Court finds that AFRC's arguments about the administrative and economic costs of remand without vacatur are too abstract and speculative to clearly outweigh its benefits.

AFRC also argues that granting FWS's motion would unfairly prevent it from challenging the critical habitat rule in court, and that if this Court were to reach the merits of its claims, the rule would likely be vacated.  See AFRC VR Opp'n 8-10, 14.  But the Court is not persuaded that a plaintiff's "right of access to the courts," which AFRC asserts here, is alone sufficient to prevent voluntary remand without vacatur.  See id. at 8.  If this were the case, then opposed motions for voluntary remand without vacatur would almost never be granted.  Yet such motions are commonly granted even when they are opposed.  See, e.g., Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta, 375 F.3d 412, 417-18 (6th Cir. 2004); Ethyl Corp., 989 F.2d at 523-24; Carpenters Indus. Council, 734 F. Supp. 2d at 134-35; Sierra Club, 560 F. Supp. 2d at 24-26.

Nevertheless, AFRC offers more than just its right to be heard as a reason to reach the merits here.  Because an error like the one conceded by FWS may be grounds for vacatur of a

rule, AFRC's argument about the likely result on the merits, if reached, deserves discussion.

After an agency rule or order has been found unlawful on the merits, the decision whether to vacate or remand without vacatur depends on: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted). AFRC argues that these factors would support vacatur at the merits stage and hence that they counsel against remand without vacatur now.

The first Allied-Signal factor deals with the likelihood that a rule's deficiencies can be redressed on remand, "even if the agency reaches the same result." See Black Oak Energy, LLC v. FERC, Nos. 08-1386, 11-1275, 12-1286, 2013 WL 3988709, at *11 (D.C. Cir. Aug. 6, 2013) (citing Allied-Signal, 988 F.2d at 150-51). FWS's position is that a more detailed explanation on remand can remedy the deficiencies in the current critical habitat designation because all of the areas designated either were occupied at the time of listing or meet the more demanding standard for unoccupied habitat. See FWS VR Mot. 11, 13; Frazer Decl. ¶ 5. AFRC sees it differently, arguing that if this case proceeded to the merits, it could establish "a major substantive flaw in the 1996 rule," which could not be cured on remand. AFRC VR Opp'n 15. AFRC points to FWS's 2011 statement that "each of the areas designated as critical habitat is within the geographical area occupied by the species at the time it was listed," and asserts that, because FWS indicated that all areas were designated on the basis that they were "occupied," FWS cannot on remand re-designate the same areas on the basis that they were not occupied yet "essential for the conservation of the species." See 16 U.S.C. § 1532(5)(A)(ii); AFRC VR Opp'n 3, 15-17

(citing 76 Fed. Reg. 61,599, 61,604 (Oct. 5, 2011)).

This is incorrect. Just because FWS said that all of the areas designated were occupied at the time of listing does not make it so. AFRC recognizes as much, arguing in its Fourth Claim that FWS unlawfully designated critical habitat that was "not occupied at the time of listing." See Compl. [ECF 1] ¶¶ 47-50. AFRC cannot argue that FWS erroneously found that the designated areas were occupied, see id., and at the same time seek to bind the agency to that (allegedly erroneous) finding, see AFRC VR Opp'n 17. If AFRC is correct that some designated areas were not occupied at the time of listing, then such areas were "outside the geographical area occupied by the species" and possibly qualify as critical habitat under 16 U.S.C. § 1532(5)(A)(ii). On remand, then, FWS may be able to justify the current designation by adequately explaining that the designated areas were in fact occupied at the time of listing and did in fact contain PCEs. Or, notwithstanding that FWS apparently designated all critical habitat on the basis that it was occupied, the agency may determine on remand that some of the areas designated, though not occupied, are critical habitat because they are essential for the conservation of the murrelet. See Otay Mesa, 646 F.3d at 918 (indicating that FWS, which had designated land on basis that it was occupied, might be able to justify re-designation on remand on basis that it was "'essential for the conservation of the species'"). Thus, it is "plausible that [FWS] can redress its failure of explanation on remand while reaching the same result." See Black Oak Energy, 2013 WL 3988709, at *11 (citing Lone Mountain Processing, Inc. v. Sec'y of Labor, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("The Commission may well arrive at the same result it reached originally, but it must do so with more clarity than it showed in the first instance.")).

That is not to say that the Court would not vacate the critical habitat designation if it

reached the merits. Courts have vacated critical habitat rules where FWS has failed to adequately explain how designated areas met the definition of critical habitat set forth in 16 U.S.C. § 1532(5)(A). See, e.g., Otay Mesa, 646 F.3d at 918 (vacating designation of property as critical habitat because record did not support FWS's determination that property at issue was "occupied" at time of listing); Cape Hatteras, 344 F. Supp. 2d at 122-23 (vacating critical habitat that included areas FWS determined to be "occupied" but on which PCEs were not "found"); Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv., 268 F. Supp. 2d 1197, 1237-39 (E.D. Cal. 2003) (rejecting intervenor's argument for remand without vacatur and vacating critical habitat, in significant part because of "serious" errors in FWS's legal description of critical habitat). In Otay Mesa, the D.C. Circuit even noted that FWS might be able to justify a re-designation on remand, but vacated nevertheless (though the court did not address remand without vacatur as an alternative to vacatur in that case). See 646 F.3d at 918.

In summary, reaching the merits in this case might lead to remand without vacatur, because it is plausible that further explanation on remand can redress the rule's deficiencies, or it might instead lead to vacatur, as has resulted in some similar cases. At this time, however, the Court is not in a position to fully assess the seriousness of the deficiencies or to predict whether or how the new designation will differ from the current designation. It will be for the agency in the first instance to determine what it means for areas to be "occupied" by the murrelet and, with respect to any areas it determines were not occupied at the time of listing, whether they are essential to the conservation of the species. See FWS VR Mot. 10 (stating that FWS "did not set forth any standard to define occupancy" in 1996); see also, e.g., Ariz. Cattle Growers' Ass'n, 606 F.3d at 1164 ("Determining whether a species uses an area with sufficient regularity that it is

'occupied' is a highly contextual and fact-dependent inquiry."); Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior, 344 F. Supp. 2d 108, 119-20 (D.D.C. 2004) (deferring to FWS's definition of "occupied" as applied to piping plover). Because a decision on the merits would not necessarily result in vacatur or require FWS to change the substance of the current rule, the Court concludes that the first Allied-Signal factor does not weigh strongly in favor of AFRC's position now.

The Court next turns to the second Allied-Signal factor, the "disruptive consequences" of vacatur. If, as FWS asserts here, the revised rule will be little different from the current rule, then a three-year interim vacatur – of a longstanding rule that has been in place since 1996 – may well be disruptive. See FWS VR Reply 7 (stating that FWS "has no reason to believe . . . that any of the areas currently designated will not qualify as critical habitat"). FWS maintains its position that interim vacatur would not result in significant harm to the murrelet, see FWS VR Mot. 14, and AFRC stresses this as well, see AFRC VR Opp'n 11-12, 18. But as the Court noted in its March 30, 2013 memorandum opinion, vacating murrelet critical habitat altogether may have unpredictable and irreversible consequences. See Am. Forest Res. Council, 2013 WL 1289724, at *26; see also, e.g., Natural Res. Def. Council, 275 F. Supp. 2d at 1146 ("The strong public policy in favor of environmental protection indicates that the Court should resolve uncertainties in estimating the risk of harm from habitat conversion during remand, in the absence of viable critical habitat designations, in favor of retaining the disputed rules."). At any rate, the second Allied-Signal factor does not strongly favor vacatur.

3.      The equities support remand without vacatur at this time.

Weighing the equities here, the Court will grant FWS's motion for voluntary remand

25

without vacatur.  As previously stated, avoiding further litigation of this matter will conserve the resources of the Court and the parties, as well as taxpayer dollars.  A substantial part of the relief requested – a remand of the murrelet critical habitat designation to FWS – will be granted whether FWS's motion is granted now or AFRC prevails on the merits later.  Although FWS hints that briefing on the merits would be "solely" about vacatur, the Court has little confidence that the merits litigation would be so confined.  AFRC does not limit its request to briefing the issue of vacatur, and intervenors do not concede that AFRC would prevail on its critical habitat claims.  See AFRC VR Opp'n 2, 19 (request to "present[] dispositive summary judgment motions on the critical habitat claims"); Intervenors' VR Resp. 4-5 (stating that merits determination would require "review of the not-yet-filed administrative record and fully-developed legal argument").  And even if the appropriateness of vacatur were the only issue before the Court, determining the seriousness of the critical habitat rule's deficiencies would necessitate the expenditure of considerable time and resources.

In addition, even if the merits of AFRC's claims are decided, open questions – for example, which areas were occupied by the murrelet at the time of listing,[7] whether the specific areas that were occupied contain PCEs, and whether any unoccupied areas are essential to the conservation of the species – will remain regardless of whether the designation is vacated. Granting FWS's motion will allow the agency to revise the designation based on its reconsidered construction of the ESA, which the Court need not weigh in on in the first instance.  See SKF, 254 F.3d at 1029-30 (stating that where statute leaves gap for agency to fill, remand is required).

---

[7] See, e.g., Cape Hatteras, 344 F. Supp. 2d at 120 ("[T]his Court has no expertise when it comes to determining which lands a migratory bird does or does not occupy." (citation omitted)).

Finally, the Court concludes that, although AFRC has raised some legitimate objections, it will not be unduly prejudiced by remand without vacatur. As a practical matter, since briefing on the merits has not yet transpired, it would be many months before a decision on the merits could be rendered by the Court. The critical habitat designation would remain in force during that time regardless of the Court's decision today, and so the additional amount of time that AFRC will be subject to the rule as a result of voluntary remand is actually less than three years. Also, the murrelet critical habitat designation is a longstanding rule that may be justified by FWS on remand. The real possibility that the rule's deficiencies can be addressed on remand, and hence that the rule would not be vacated in any case, decreases the expected benefit to AFRC and the public of going forward with this litigation now. That possibility also increases the likelihood that a three-year interim vacatur will be unduly disruptive. And AFRC has not convinced the Court that the ill-defined prejudice to its timber interests outweighs the certain benefits to be gained by avoiding further litigation. Hence, the Court will remand the murrelet critical habitat designation to FWS and order FWS to submit a new proposed critical habitat designation by not later than September 30, 2015, and a new final critical habitat designation by not later than September 30, 2016.

## CONCLUSION

For the foregoing reasons, the Court will deny AFRC's motion for summary judgment on its Third Claim, grant FWS's and intervenors' cross-motions, and grant FWS's motion for voluntary remand. A separate order accompanies this memorandum opinion.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: September 5, 2013